**DEREK SMITH LAW GROUP, LLP**
Matt E.O. Finkelberg, Esq. (SBN 329503)
633 West 5th Street, Suite 3250
Los Angeles, CA 90071
Telephone:    (310) 602-6050
Facsimile:    (310) 602-6350
Email:        matt@dereksmithlaw.com

*Attorneys for Plaintiff John Doe*

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE, an Individual,<br><br>Plaintiff,<br><br>vs.<br><br>BASS CAMP FESTIVAL, INC.; PR ENTERTAINMENT, INC; PAUL REDER, individually; PHYLLIS WEINER, individually;  MATTHEW STEGEMILLER, individually; NICK ROGERS, individually; CAROLYN WEINER, individually; PRE PRESENTS, LLC; PRE PRESENTS L.L.C.; BASS CAMP MUSIC, LLC; COLUMBIA SUSSEX CORPORATION; COLUMBIA SUSSEX MANAGEMENT, LLC; and Does 1-25, inclusive,<br><br>Defendants. | Case No.: 2:24-cv-06787<br><br>COMPLAINT FOR MONETARY AND PUNITIVE DAMAGES<br><br>1.   Violations of the Trafficking Victims' Protection Act<br><br>2.   Violations of the Sexual Abuse and Cover Up Accountability Act<br><br>3.   Sexual Battery<br><br>4.   Sexual Assault<br><br>5.   Intentional Infliction of Emotional Distress<br><br>6.   Negligent Infliction of Emotional Distress<br><br>DEMAND FOR JURY TRIAL |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff John Doe, by and through his attorneys, the Derek Smith Law Group, LLP, hereby complains of Defendants BASS CAMP FESTIVAL, INC.; PR ENTERTAINMENT, INC; PAUL REDER, individually; PHYLLIS WEINER, individually; MATTHEW STEGEMILLER, individually; NICK ROGERS, individually; CAROLYN WEINER, individually; PRE PRESENTS, LLC; PRE PRESENTS L.L.C.; BASS CAMP MUSIC, LLC; COLUMBIA SUSSEX CORPORATION; and COLUMBIA SUSSEX MANAGEMENT, LLC, upon information and belief, as follows:

## NATURE OF THE CASE

1.    Plaintiff brings this action charging pursuant to, *inter alia*, the Trafficking Victims Protection Act 18 U.S.C. § 1591, and the laws of the State of California, seeking damages to redress the injuries Plaintiff has suffered as a result of being trafficked, sexually assaulted, battered, retaliated against, and harassed.

## JURISDICTION AND VENUE

2.    Jurisdiction of this action is conferred upon this Court as this case involves a federal question under 18 U.S.C. § 1591 and 28 U.S.C. §1331 states that "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

3.    This Court has supplemental jurisdiction over Plaintiff's related state law and local ordinance claims pursuant to 28 U.S.C. § 1367(a) because his claims under California law form part of the same case or controversy under Article III of the

United States Constitution.  Plaintiff's state law claims share all common operative facts with Plaintiff's federal law claims, and the parties are identical.

4.     Venue properly lies in the Central District of California in that a substantial part of the events or omissions giving rise to the claim occurred in Los Angeles, CA pursuant to 28 U.S.C. 1391.

5.     This court has jurisdiction to hear both statutory and common law claims against Defendants.

6.     Around March 11, 2024, the Parties entered into a tolling agreement with Defendants.

### THE PARTIES

7.     Plaintiff JOHN DOE ("Plaintiff") is an individual residing in Los Angeles, CA.

8.     Plaintiff is a sexual assault victim and is identified herein as JANE DOE. Please see *Doe v. Blue Cross & Blue Shield United of Wisc.,* 112 F.3d 869, 872 (7th Cir. 1997) ("fictitious names are allowed when necessary to protect the privacy of ... rape victims, and other particularly vulnerable parties or witnesses"). Additionally, "the public generally has a strong interest in protecting the identities of sexual assault victims so that other victims will not be deterred from reporting such crimes."  *Doe No. 2 v. Kolko,* 242 F.R.D. 193, 195 (E.D.N.Y. 2006); *see also Doe v. Evans,* 202 F.R.D. 173, 176 (E.D. Pa. 2001) (granting anonymity to sexual assault victim); *Doe v Penzato*, No. 10 Civ. 5154 (MEJ), 2011 WL 1833007, at *3 (N.D. Cal. May 13,

2011).  In *Starbucks Corp. v. Superior Court*, the Fourth District Court of Appeal noted:  "The judicial use of 'Doe plaintiffs' to protect legitimate privacy rights has gained wide currency, particularly given the rapidity and ubiquity of disclosures over the World Wide Web."  168 Cal. App. 4th 1436, 1452 n.7 (2008) (Citing, *inter alia*, *Doe v. City of Los Angeles*, 42 Cal. 4th 531 (2007) (former Boy Scouts alleging that police officer sexually assaulted them as teenagers entitled to sue under pseudonyms).)  Thus, as the Third District Court of Appeal has noted, "there have been countless published state court decisions where one or more of the parties have used fictitious names."  *Doe v. Lincoln Unified Sch. Dist.*, 188 Cal. App. 4th 758, 766 (2010) (citing *Doe v. Saenz*, 140 Cal. App. 4th 960 (2006) (convicted felons permitted pseudonymously challenge Department of Social Services decision classifying their offenses as non-exemptible, thereby precluding them from working in licensed community care facilities); *Hooper v. Deukmejian*, 122 Cal. App. 3d 987 (1981) (individual convicted of maintaining place for selling or using "narcotics" permitted to sue pseudonymously to determine entitlement to protections of marijuana reform legislation); *Jane Doe 8015 v. Superior Court*, 148 Cal. App. 4th 489 (2007) (clinical laboratory patient infected with HIV by phlebotomists entitled to sue laboratory pseudonymously); *Doe v. Bakersfield City Sch. Dist.*, 136 Cal. App. 4th 556 (2006) (former student alleging sexual abuse by former guidance counselor permitted to pursue action pseudonymously). In *Doe v. Lincoln Unified School District*, the Court of Appeal applied the Ninth Circuit's test for litigant anonymity: "a party may

preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the parties' identity." 188 Cal. App. 4th at 767 (citing *Does I-XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068-69 (9th Cir. 20000). Specifically, the Court of Appeal approvingly cited the Ninth Circuit's summary of the three situations warranting pseudonymity:  (1) when identification creates a risk of retaliatory physical or mental harm; (2) when anonymity is necessary to preserve privacy in a matter of sensitive and highly personal nature; and (3) when the anonymous party risks criminal prosecution.  *Id.* (citing *Advanced Textile Corp.*, 214 F.3d at 1067-68). Thus, the Ninth Circuit has allowed parties to use pseudonyms when non-disclosure of a party's identity "is necessary . . . to protect a person from harassment, injury, ridicule or personal embarrassment." *Advanced Textile*, 214 F.3d at 1067-68 (citations omitted).  The most compelling of these situations "involve matters which are highly sensitive, such as social stigmatization." *See Doe v. Rostker*, 89 F.R.D. 158, 162 (N.D. Cal. 1981).  Cases where a party is forced to reveal sexual information, or cases involving issues of "human sexuality" are considered particularly sensitive. *See Jane Roes 1-2 v. SFBSC Mgmt., LLC*, 77 F. Supp. 3d 990 990, 994 (N.D. Cal. 2015) (collecting examples).  Unsurprisingly, then, courts recognize that plaintiffs should be permitted to proceed anonymously when they allege sexual assault. *See, e.g., E.E.O.C. v. ABM Indus. Inc.*, 249 F.R.D. 588, 593 (E.D. Cal. 2008) (permitting plaintiffs to intervene anonymously where "[t]hey are

concerned that they will be embarrassed by the public disclosure of the nature of their allegations against Defendants, which if proven, will identify them as victims of sexual harassment and sexual crimes in the small community where they live and work").

9.     At all times material, Defendant BASS CAMP FESTIVAL, INC. ("FESTIVAL") was and is a corporation doing business in the State of California, with their principal place of business located at 1150 Hwy 50 #B, Zephyr Cove, NV, 89448. Defendant BASS held supervisory authority over Plaintiff, controlling various tangible aspects of Plaintiff's employment, including the ability to hire and fire Plaintiff.

10.     At all times material, Defendant PR ENTERTAINMENT, INC. ("PR") was and is a corporation doing business in the States of California and Nevada, with their principal places of business located at 14 LAKESIDE COVE ROAD, B-1562, Zephyr Cove, NV 89448. Defendant PR held supervisory authority over Plaintiff, controlling various tangible aspects of Plaintiff's employment, including the ability to hire and fire Plaintiff.

11.     At all times material, Defendant PAUL REDER ("REDER") was and is the President and Chief Executive Officer for Defendants PR, PRE, PRE P, FESTIVAL, and MUSIC. Defendant REDER held supervisory authority over Plaintiff, controlling various tangible aspects of Plaintiff's employment, including the ability to hire and fire Plaintiff.  Defendant REDER's primary residences are located

in Manhattan Beach, CA and Zephyr Cove, NV.

12.    At all times material, Defendant PHYLLIS WEINER ("WEINER") was and is the sister of Defendant REDER and owned, rented, and leased the property in which many of the acts alleged against Defendants took place.

13.    At all times material, Defendant MATTHEW STEGEMILLER ("STEGEMILLER") was and is one of the owners of The Loft and Defendant PR, which employed Plaintiff. Defendant STEGEMILLER held supervisory authority over Plaintiff, controlling various tangible aspects of Plaintiff's employment, including the ability to hire and fire Plaintiff.

14.    At all times material, Defendant NICK ROGERS ("ROGERS") was and is an employee for Defendants PR, PRE, PRE P, FESTIVAL, and MUSIC. Defendant ROGERS' primary residence is located in CA.

15.    At all times material, Defendant CAROLYN WEINER ("CAROLYN") was and is the niece of Defendant REDER.

16.    At all times material, Defendant PRE PRESENTS, LLC ("PRE") was and is a corporation doing business in the States of California and Nevada, with their principal places of business located at 1001 Heavenly Village Way #50, South Lake Tahoe, CA 96150. Defendant PRE held supervisory authority over Plaintiff, controlling various tangible aspects of Plaintiff's employment, including the ability to hire and fire Plaintiff.

17.    At all times material, Defendant PRE PRESENTS L.L.C. ("PRE P") was

and is a corporation doing business in the States of California and Nevada, with their principal places of business located at 1150 Hwy 50 House #4, Lakeside Cove Resort, Zephyr Cove, NV, 89448. Defendant PRE P held supervisory authority over Plaintiff, controlling various tangible aspects of Plaintiff's employment, including the ability to hire and fire Plaintiff.

18.    At all times material, Defendant BASS CAMP MUSIC, LLC ("MUSIC") was and is a corporation doing business in the State of California, with their principal place of business located at PO Box 1562, Zephyr Cove, NV, 89448. Defendant MUSIC held supervisory authority over Plaintiff, controlling various tangible aspects of Plaintiff's employment, including the ability to hire and fire Plaintiff.

19.    At all times material, Defendant COLUMBIA SUSSEX CORPORATION ("COLUMBIA SUSSEX") was and is a corporation doing business in the States of California and Nevada, with their principal place of business located at 740 Centre View Blvd, Crestview Hills, CA 94017. Defendant COLUMBIA SUSSEX owned and operated the Horizon Casino Resort.

20.    At all times material, Defendant COLUMBIA SUSSEX MANAGEMENT, LLC ("COLUMBIA SUSSEX MANAGEMENT") was and is a corporation doing business in the State of Nevada, with their principal place of business located at 740 Centre View Blvd, Crestview Hills, KY 41017. Defendant COLUMBIA SUSSEX MANAGEMENT owned and operated the Horizon Casino Resort.

21.     Plaintiff is ignorant of the true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants named herein as DOES 1 through 25, inclusive, and therefore sues Defendants by such fictitious names.  Defendants DOES 1 through 25, at all times relevant for purposes of this Complaint were employees, agents, officers and/or members of the board of directors of Defendants.  Plaintiff will amend this complaint to allege the true names and capacities of the Defendants designated herein as DOES 1 through 25, inclusive, when they have been ascertained.

22.     Plaintiff is informed and believes, and on that basis alleges, that all named Defendants and those designated herein as DOES 1 through 25, inclusive, are responsible in some manner for the acts, events and occurrences alleged herein, and caused or contributed to the damages sustained by Plaintiff.

23.     Plaintiff is informed and believes, and on that basis alleges, that at all times relevant for purposes of this Complaint, the Defendants designated herein as DOES 1 through 25, inclusive, acted as the agents, employees, directors, officers, co-venturers, and partners of the named Defendants and such fictitiously named Defendants.  Each of them, while acting in the course and scope of their agency, employment, corporate capacities, and partnership, performed the acts and conduct hereinafter alleged, and said acts and conduct were ratified and approved by each Defendant.

24.     Each Defendant sued in this action has acted, in all respects pertinent to this action, as the other Defendant's agent, and has carried out a joint scheme,

enterprise, business plan, or policy in all respects pertinent hereto.  The acts of each Defendant are therefore legally attributable to the other Defendant.

25.    Under California law, Defendants are jointly and severally liable as employers for the violations alleged herein because they have each exercised sufficient control over Plaintiff.  Each Defendant had the power to hire and fire Plaintiff, supervise and control Plaintiff's work schedule and/or conditions of employment, determine Plaintiff's rate of pay, and maintain Plaintiff's employment records.  Defendants suffer or permit Plaintiff to work and/or "engage" Plaintiff so as to create a common law employment relationship.  As Plaintiff's joint employers, Defendants are jointly and severally liable for all relief available to Plaintiff under the law.

## FACTS COMMON TO ALL CAUSES OF ACTION

26.    At all times material, Plaintiff was and is an individual homosexual man residing in California and Nevada.

27.    Around November 11, 2012, Plaintiff, a 17-year-old minor, moved to Soda Springs, California, a new area where Plaintiff did not have community or friends. Plaintiff experienced homophobia while growing up and was apprehensive about meeting new people in Soda Springs.  Plaintiff was finishing his sophomore year of high school through a home school program at the time.

28.     In order to make friends and build a community in Plaintiff's new home, Plaintiff searched "Gay" in the Apple App Store. Plaintiff downloaded the first

application that advertised itself as a space to make friends who are also gay, and the app did not require Plaintiff to verify Plaintiff's age.

29.     Around November 28, 2012, Defendant REDER contacted Plaintiff through the app for the first time. Defendant REDER's profile at the time indicated that Defendant REDER was 36 years old, and Plaintiff noted what he believed to be a nineteen-year age gap.  Plaintiff was apprehensive when Defendant REDER initially engaged Plaintiff in small talk, and Plaintiff immediately informed Defendant REDER that Plaintiff was only 17 years old, and that Plaintiff was not interested in speaking with Defendant REDER or engaging in a sexual relationship of any kind with Defendant REDER because of their age difference.

30.     After Plaintiff informed Defendant REDER that Plaintiff was only 17 years old, Defendant REDER began an intentional and concerted effort to groom and trap Plaintiff in a situation and environment wherein Plaintiff had no choice but to turn to Defendant REDER for necessities and financial support.  Defendant REDER's first step was to gain Plaintiff's trust and separate Plaintiff from Plaintiff's community and support system, both emotionally and physically.

31.     During their first conversation, and after Plaintiff informed Defendant REDER that Plaintiff was a minor, Defendant REDER began telling Plaintiff that Defendant REDER found Plaintiff attractive.  Plaintiff immediately rebuffed Defendant REDER's predatory advances and reiterated Plaintiff's age as that of a 17-year-old minor.  Plaintiff also expressed discomfort with Defendant REDER's age and

what Plaintiff thought was their nineteen-year age gap.

32.     However, Defendant REDER insisted on forming a friendship with Plaintiff despite their age difference and pressured Plaintiff to continue talking to Defendant REDER as a confidante and mentor. Plaintiff was anxious about maintaining contact, but Defendant REDER persisted, doing so in order to condition and groom Plaintiff.

33.     Thereafter, Defendant REDER conditioned Plaintiff to confide in Defendant REDER, and Defendant REDER slowly earned Plaintiff's trust.  Plaintiff shared details about his personal life with Defendant REDER, such as Plaintiff's new job as a dishwasher, Plaintiff's new living situation with his stepsister, Plaintiff's desire to attend college to earn a degree, and Plaintiff's desire to learn music production to eventually become a Disc Jockey ("DJ").

34.     Plaintiff also shared with Defendant REDER that Plaintiff came from an exceedingly small town and that people had bullied Plaintiff since the third grade because Plaintiff was gay.  Plaintiff also shared that he was completing his sophomore year of school through a home-schooling program.

35.     Defendant REDER then shared pictures of Defendant REDER's various cars and houses, DJ events Defendant REDER organized, and pictures Defendant REDER had taken with various celebrities, such as Rob Schneider, Chelsea Handler, and Will Ferrell.  Defendant REDER shared these photos and boasted to Plaintiff about his wealth in order to further entice Plaintiff to continue engaging with

Defendant REDER and to earn Plaintiff's trust and admiration.

36.    During these conversations, Defendant REDER offered to mentor Plaintiff and offered Plaintiff a job working for Defendant REDER, and Defendant REDER encouraged Plaintiff to quit Plaintiff's job as a dishwasher. Defendant REDER insisted Plaintiff consider the employment offer, stating, ***"I can drive out and pick you up, and we can discuss it over dinner."***

37.    Plaintiff was deeply uneasy, but continued engaging with Defendant REDER because Plaintiff believed Defendant REDER had Plaintiff's best interests at heart and because Defendant REDER had stated he could provide Plaintiff with a job. Defendant REDER continued pressuring Plaintiff to meet with him.

38.    Around December 2, 2012, Defendant REDER sent Plaintiff an eBook about Steve Jobs as a way to show Plaintiff that Defendant REDER had an interest in Plaintiff's professional development.

39.    Over the next week, Defendant REDER repeatedly messaged Plaintiff and pressured Plaintiff to meet with Defendant REDER.  Plaintiff shared with Defendant REDER that Plaintiff had not fully shared with his stepsisters that Plaintiff was gay.  During their initial conversation, Plaintiff also shared with Defendant REDER that Plaintiff's sisters said negative things about gay people, but that Plaintiff's sisters were also very protective and would want to meet Defendant REDER if Defendant REDER was picking up Plaintiff.  Defendant REDER said it would be unacceptable for Plaintiff's sisters to meet Defendant REDER, so Defendant

REDER devised a plan to pick up Plaintiff without meeting Plaintiff's sisters.

40.     Around December 7, 2012, Defendant REDER arrived at Plaintiff's home in Soda Springs, California, in a Silver 4 door BMW 7 series. Defendant REDER persuaded Plaintiff to ensure that Plaintiff's sisters remained inside when Plaintiff left the house to meet Defendant REDER. Defendant REDER convinced Plaintiff to deliberately lie and tell Plaintiff's sisters that Defendant REDER was Plaintiff's "friend Tyler's Uncle" who was picking up Plaintiff for a "weekend with Tyler." Defendant REDER's plan made it certain Plaintiff's sisters did not have an opportunity to see Defendant REDER or question Defendant REDER's connection to Plaintiff.

41.     Immediately after Defendant REDER left Plaintiff's home with Plaintiff in the front seat, Defendant REDER showered Plaintiff with inappropriate and sexual comments. Defendant REDER flirted with Plaintiff despite the proposed employment relationship and what Plaintiff at the time believed to be their nineteen-year age difference. Defendant REDER made endless comments about Plaintiff's appearance, how attractive Defendant REDER believed Plaintiff to be, and Plaintiff's age, explicitly acknowledging Plaintiff was a minor and that Plaintiff's youthful age was a positive and attractive to Defendant REDER. Defendant REDER also put Defendant REDER's hand on Plaintiff's thigh and held Plaintiff's hand.

42.     At one point during the car ride, Defendant REDER bombarded Plaintiff with "ground rules." Defendant REDER emphasized that Defendant REDER expected

the utmost confidentiality from Plaintiff regarding Defendant REDER's relationship with Plaintiff. Defendant REDER further emphasized, ***"I could get in a lot of trouble for meeting you,"*** and ***"You can never tell anyone what is really happening. Ever."***

43.    In an effort to rebuff Defendant REDER's advances, and unaware of the law, Plaintiff expressed fears of going to jail as a consequence of being with Defendant REDER because Plaintiff was a minor. In response, Defendant REDER promptly told Plaintiff, ***"Don't worry about it. The age of consent in Nevada is sixteen."*** Defendant REDER's response communicated Defendant REDER's desire and intent to continue pressuring and coercing Plaintiff into an intimate relationship with Defendant REDER, despite Plaintiff's age as a 17-year-old minor and despite Plaintiff's assertions that Plaintiff did not want to engage in a sexual relationship with Defendant REDER.

44.    Defendant REDER's actions were sexually predatory because Defendant REDER held power over Plaintiff, and Defendant REDER's power over Plaintiff was created by the combination of the job Defendant REDER promised to Plaintiff, Plaintiff's perception of the nineteen-year-age difference, and Plaintiff's isolated environment. Plaintiff found himself thinking about his own job security, physical safety, and well-being if he displeased or opposed Defendant REDER.

45.    Thereafter, Defendant REDER's romantic and sexual advances toward Plaintiff became more overt and frequent as Defendant REDER approached the California-Nevada state line. Defendant REDER made numerous inappropriate

comments toward Plaintiff to condition Plaintiff, including, **"You can never tell anyone about this,"** and **'You're the youngest I've ever met,"** signaling to Plaintiff that Defendant REDER had pursued other intimate relationships with younger boys in the past.

46.     After Defendant REDER crossed the California state line into Nevada, Defendant REDER said, **"I just can't wait any longer."** Defendant REDER then pulled the car over and forcibly kissed Plaintiff on the lips and forcibly inserted his tongue into Plaintiff's mouth. Plaintiff was shocked and terrified.

47.     Defendant REDER violated the Trafficking Victims Protection Act when he coerced Plaintiff, a minor, into crossing state lines by enticing Plaintiff with the promise of employment.

48.     Defendant REDER sexually assaulted and sexually battered Plaintiff.

49.     Defendant REDER noticed Plaintiff's discomfort and asked, **"What do you want to do?"** In hopes of deterring further advances from Defendant REDER, Plaintiff suggested a public pizza place. Not wanting to be seen in public with Plaintiff, Defendant REDER evaded the public eye by suggesting they order takeout to Defendant REDER's home in Lake Tahoe, Nevada instead.

50.     After Defendant REDER picked up the food, Defendant REDER purchased a bottle of alcohol and took Plaintiff to Defendant REDER's home. Once Defendant REDER and Plaintiff arrived at Defendant REDER's home in Lake Tahoe, Nevada, Defendant REDER encouraged, pressured, and coerced Plaintiff, a 17-year-

old minor, to drink alcohol and smoke marijuana until Plaintiff's motor functions were impaired. After Defendant REDER caused Plaintiff to be inebriated, Defendant REDER, once again, forcibly kissed Plaintiff on the lips.

51.     Defendant REDER told Plaintiff, *"I want to have sex with you in every room of the house."* Defendant REDER continued forcibly kissing Plaintiff and proceeded to remove Plaintiff's clothing. After removing Plaintiff's clothing, Defendant REDER ushered Plaintiff to the master bedroom.

52.     Defendant REDER then guided Plaintiff into the shower while Plaintiff was intoxicated, washed Plaintiff's naked body, and proceeded to perform oral sex on Plaintiff, a 17-year-old minor.

53.     Defendant REDER then proceeded to guide Plaintiff into different rooms of Defendant REDER's home, and Defendant REDER forcibly performed oral sex on Plaintiff in each of the rooms.

54.     Defendant REDER violated the Trafficking Victims Protection Act when he coerced Plaintiff, a minor, into crossing state lines by enticing Plaintiff with the promise of employment, and ultimately sexually assaulted and sexually battered Plaintiff as a result of the enticement.

55.     Defendant REDER falsely imprisoned Plaintiff.

56.     Defendant REDER sexually assaulted and sexually battered Plaintiff.

57.     Defendant REDER's sister, Defendant WEINER, owned the home and property in Zephyr Cove that Defendant REDER took Plaintiff to sexually assault and

sexually batter Plaintiff.

58.    Around the next day, December 8, 2012, Plaintiff woke up feeling disgusted and used.  Plaintiff immediately asked Defendant REDER to take Plaintiff home after Defendant REDER had woken up.  Defendant REDER was frustrated at Plaintiff's request to go home and told Plaintiff that Defendant REDER thought Plaintiff was staying for the weekend and that Defendant REDER wanted Plaintiff to stay for the entire weekend.  Plaintiff lied and told Defendant REDER that Plaintiff felt very sick and nauseous, but Defendant REDER gave Plaintiff antacids and food in the hopes that Plaintiff would feel better and stay longer.  However, Plaintiff continued to plead with Defendant REDER for Defendant REDER to take Plaintiff home.  Defendant REDER eventually agreed and became passive aggressive with Plaintiff, seemingly to guilt Plaintiff into staying longer or to cause Plaintiff to feel as if Plaintiff was in trouble so Plaintiff would stay longer.

59.    Before Defendant REDER took Plaintiff home, Defendant REDER walked Plaintiff around the boat pier of Defendant REDER's home in Nevada. Throughout the walk, Defendant REDER reminded Plaintiff that Defendant REDER could *"get in trouble for being with [Plaintiff],"* and elaborated on the "ground rules" for Plaintiff to be in public with Defendant REDER. Defendant REDER further conditioned Plaintiff to refrain from engaging in physical contact with Defendant REDER, walk too close to Defendant REDER, or display affection toward Defendant REDER publicly, including hugging and hand holding.  Defendant REDER also told

Plaintiff that, if anyone asked, to tell people that Plaintiff was Defendant REDER's nephew.

60.    Before they left the pier, Defendant REDER took a picture of Plaintiff.

61.    Later that same day, Defendant REDER drove Plaintiff back to California. Defendant REDER left Plaintiff, a 17-year-old minor, with a bottle of alcohol, marijuana, and a grinder for marijuana.  After Defendant REDER left Plaintiff at Plaintiff's home, Defendant REDER also gave Plaintiff $200 in cash for "Christmas."

62.    Between December of 2012 and the beginning of February 2013, Plaintiff had blocked Defendant REDER on social media and tried to forget what had happened with Defendant REDER.  However, Plaintiff was experiencing difficulties in his personal life and with his mental health and decided to unblock Defendant REDER because Plaintiff had remembered Defendant REDER's job offer. Defendant REDER had also manipulated Plaintiff into believing that Defendant REDER was Plaintiff's only shot at learning about the DJ industry, and that Defendant REDER's job offer would help Plaintiff enter the DJ industry.

63.    After Plaintiff reinitiated contact with Defendant REDER, while Plaintiff was still a minor, Defendant REDER assured Plaintiff that Defendant REDER intended to create an employment opportunity for Plaintiff at a hotel named the Horizon Casino at the time.

64.    Around February 14, 2013, Defendant REDER emailed Tony Russo the

following message:

> Hi Tony – Clark and I spoke yesterday, and we are starting
> [Plaintiff] on our team.  I think I told you about [Plaintiff], he is
> a friend's nephew that just moved to Tahoe.  We are going to
> use him starting next week for Illusion Fusion street teaming
> and marketing.  We'd also like him to train in each position
> within the cabaret in the event someone is sick, needs a day off,
> quits, or vacations.  I'd like him to train starting in the Box
> Office next Thursday, then make his rounds between spotlight,
> backstage, door, sound, etc.  I will meet you all there and make
> the introduction.
>
> Thanks
>
> Paul

65.    Beginning with Defendant REDER's email to Mr. Russo, Defendant REDER began the lie that Plaintiff was one of Defendant REDER's friend's nephews that had recently moved to Lake Tahoe.

66.    Around February 20, 2013, Defendant REDER retrieved Plaintiff from Plaintiff's home in California and transported Plaintiff to Zephyr Cove, Nevada, by crossing state lines.

67.    Around February 21, 2013, Defendant REDER had moved Plaintiff completely to Defendant REDER's home in Nevada.  Defendant REDER initially wanted Plaintiff to live and stay in Defendant REDER's own bedroom and to keep Plaintiff's things in another bedroom; however, Plaintiff chose to sleep in the separate bedroom instead.

68.    Throughout the time Plaintiff lived in Defendant REDER's home,

Defendant REDER went to Plaintiff's bedroom when he thought Plaintiff was asleep and stared at Plaintiff for a few minutes until Defendant REDER left.  Defendant REDER usually left the bedroom door cracked open when he went to Plaintiff's room, but Plaintiff always closed the door after Defendant REDER left.

69.     After Defendant REDER moved Plaintiff into Defendant REDER's home, Defendant REDER took Plaintiff to see Defendant REDER's magic show, called Illusion Fusion, and introduced Plaintiff to members of the show's crew.

70.     After the show, Defendant REDER pressured Plaintiff to have sex with Defendant REDER, but Plaintiff rebuffed Defendant REDER's sexual advances and said he had homework to complete.  Plaintiff isolated himself in the room provided by Defendant REDER in Defendant REDER's home to avoid Defendant REDER's sexual advances.

71.     After Defendant REDER provided Plaintiff with housing and a job, Defendant REDER established additional "ground rules" with Plaintiff. Defendant REDER conditioned Plaintiff to share with anyone who asked that Defendant REDER was Plaintiff's "uncle." Defendant REDER also emphasized that Defendant REDER did not want anyone to learn that Plaintiff was gay.

72.     As part of Defendant REDER's plan to further control and manipulate Plaintiff, Defendant REDER took Plaintiff to obtain a new haircut and purchase a new wardrobe that included business casual clothes, button-up shirts, nice sweaters, and the like.  Defendant REDER told Plaintiff that Defendant REDER wanted Plaintiff to

*"look older"* in the way Plaintiff dressed and the way Plaintiff wore his hair.

Defendant REDER also told Plaintiff not to wear a baseball cap or other similar hats

because they caused Plaintiff to appear too young i.e. Plaintiff's actual age.

73.     Defendant REDER violated the Trafficking Victims Protection Act when

he coerced Plaintiff, a minor, into crossing state lines by enticing Plaintiff with the

promise of employment and changing Plaintiff's appearance so Plaintiff would appear

older to evade suspicion.

74.     Defendant REDER violated the Sexual Abuse and Cover Up

Accountability Act by coercing Plaintiff to hide and misrepresent his age, sexual

orientation, and relationship to Defendant REDER so Defendant REDER could cover-

up the sexual battery and sexual assault inflicted on Plaintiff.

75.     Around February 28, 2013, because there were no job openings at the

time, Defendants REDER, PR, PRE, and PRE P hired Plaintiff for a position which

Defendants REDER, PR, PRE, and PRE P specifically created for Plaintiff; Plaintiff

then worked his first shift at Defendant COLUMBIA SUSSEX's Horizon Casino box

office.  Defendant REDER specifically created this job for Plaintiff so he continued to

have leverage over Plaintiff, allowing him to continue to abuse, sexually traffic,

sexually assault, and sexually batter Plaintiff.  Defendant REDER told Plaintiff that

Plaintiff would train in every position and be on call if anyone called in sick.

Plaintiff's duties included assisting with ticket purchases and flier distribution for

Illusion Fusion. Throughout Plaintiff's employment, Defendants directed Plaintiff to

deliver show fliers, deliver tickets for shows to ticket-purchasers, and/or walk along the village area to promote the shows.

76.     Around March 3, 2013, Defendant REDER's sister, DEFENDANT WEINER, came to town and stayed with Defendant REDER. Before Defendant WEINER arrived, Defendant REDER ordered Plaintiff to hide all of Plaintiff's belongings in a storage closet, and Defendant REDER moved Plaintiff to a hotel room for the duration of Defendant WEINER's visit.

77.     Defendant REDER typically hid Plaintiff on each occasion wherein Defendant REDER's family visited Defendant REDER's home while Plaintiff lived with Defendant REDER.

78.     Around March 6, 2013, Defendant REDER asked Plaintiff how Plaintiff would feel about moving into a hotel room at the Horizon Casino full time.  Before Plaintiff could respond, Defendant REDER spoke about how it would feel like Plaintiff was on vacation all the time and it would be easier for Defendant REDER whenever Defendant REDER's sister was in town so Defendant REDER would not need to hide Plaintiff when she visited.  Defendant REDER did not want his sister to discover that Defendant REDER was sexually assaulting, battering, and trafficking a minor as he told Plaintiff that she would be mad because Plaintiff was so young.

79.     Soon thereafter, Defendants REDER, PR, PRE, and PRE P entered into an agreement with Defendant COLUMBIA SUSSEX, through their General Manager CORINNA OSBORNE, wherein Plaintiff could stay at the Horizon Casino full time.

Defendant COLUMBIA SUSSEX already comped a room for Defendants because Defendants produced Illusion Fusion, a magic show hosted by the Horizon Casino. Defendant OSBORNE agreed to rent a room to Plaintiff while Defendant REDER employed Plaintiff.

80.    CORINNA OSBORNE knew Plaintiff was only 17 years old and agreed to rent Plaintiff's room under Defendant REDER's name because Defendant COLUMBIA SUSSEX required guests be 21 years old to rent a room.

81.    Everyone Plaintiff worked with and associated with at the Horizon Casino knew Plaintiff was only 17 years old at the time; Plaintiff's co-workers and employees of the Horizon wished Plaintiff a Happy Birthday when Plaintiff turned 18 years old.

82.    On multiple occasions, security guards for the Horizon Casino prevented Plaintiff from walking across the casino floor when Plaintiff was bringing things like groceries back to his hotel room and told Plaintiff he was not allowed to stop and talk to anyone or spend time in specific spots for too long because it was obvious that Plaintiff was too young to be in a casino unattended. On some occasions, the security guards instructed Plaintiff to walk outside along the street and go around the building rather than walk directly through the casino.

83.    Defendants REDER, PR, PRE, PRE P, and COLUMBIA SUSSEX, through their employee CORINNA OSBORNE, violated the Trafficking Victims Protection Act when CORINNA OSBORNE and COLUMBIA SUSSEX assisted

Defendants REDER, PR, PRE, and PRE P with providing housing to Plaintiff even though Plaintiff was only 17 years old.

84.    Around March of 2013, Plaintiff had fully moved into the hotel room at the Horizon Casino.

85.    Because Plaintiff was living in a hotel room, Plaintiff only had a minifridge, provided by CORINNA OSBORNE, which did not have a freezer, which meant Plaintiff could not cook or store food for very long.  The inability to store or cook food caused Plaintiff to spend more money on buying food from restaurants in the expensive, tourist area he lived in or taking taxis frequently to purchase groceries. These factors put a heavy strain on Plaintiff's finances.

86.    Plaintiff also did not have access to a washing machine or dryer, which necessitated Plaintiff taking a taxi to a laundromat to pay to do his laundry, which also put a strain on Plaintiff's finances.

87.    The financial strain caused by Plaintiff's inability to cook for himself or do his laundry necessitated Plaintiff asking Defendant REDER for rides or financial assistance for food and groceries. Defendant REDER took advantage of Plaintiff's financial constraints and demanded sexual favors or sexual compliance in exchange for rides or money.

88.    The Horizon Casino also provided Plaintiff with a mailbox with his name on it.

89.    Around March 23, 2013, Defendant REDER took Plaintiff backstage of

COMPLAINT FOR MONETARY AND PUNITIVE DAMAGES

the MontBleu Casino after a show produced by Defendants REDER, PR, PRE, and PRE- P to meet Rob Schneider.  Plaintiff witnessed Defendant REDER snorting cocaine throughout the evening from a little glass container the size of a AA battery.

90.     On multiple occasions throughout the time Plaintiff worked for Defendants at the Horizon Casino, when Defendant REDER and Plaintiff walked through empty areas or private areas, such as stairwells, Defendant REDER took the opportunity to kiss Plaintiff and make sexually inappropriate comments to Plaintiff. There were no cameras in these areas and Defendant REDER knew he would not be caught if he kissed Plaintiff, held Plaintiff's hand, and made sexually inappropriate comments to Plaintiff while in secluded or private areas.

91.     Defendant REDER also frequently discussed his sexual exploits with Plaintiff, how Defendant REDER took other young boys on vacation, and bought things for the young boys.  Defendant REDER told Plaintiff about these exploits as part of his efforts to groom Plaintiff and coerce Plaintiff into engaging in more sex with Defendant REDER or formally dating Defendant REDER when Plaintiff turned 18.  Defendant REDER made comments such as, ***"I go through boys like they're candy," "I have a new boy every month,"*** and ***"I have a boy in every city."***

92.     On multiple occasions throughout the time Plaintiff worked for Defendants at the Horizon Casino, Defendant REDER picked up Plaintiff from the entrance of the Horizon Casino and kissed Plaintiff in Defendant REDER's car while on the Horizon Casino property.

93.     Around the end of March of 2013, Defendant REDER expected and required Plaintiff to work daily for Defendant REDER's shows, even though Plaintiff was in high school. Plaintiff began falling behind in his schoolwork and studies, and Plaintiff reminded Defendant REDER that Plaintiff required free time to do homework. Defendant REDER told Plaintiff, ***"I just don't really see you going to high school anymore,"*** and ***"You are working for me now and can just get a GED later."***

94.     Around this time, Plaintiff did not have access to free wi-fi while living at the Horizon Casino, and the daily rate for wi-fi was $10 to $15, which put more of a financial strain on Plaintiff. Plaintiff's inability to access free and reliable wi-fi also made it more difficult for Plaintiff to complete his schoolwork.

95.     Defendant REDER convinced Plaintiff to stop studying and taking high school courses so Plaintiff could complete the tasks and requirements set by Defendant REDER.  Defendant REDER manipulated Plaintiff into believing that Plaintiff did not need anything, including an education, because Plaintiff's life was now with Defendant REDER.  Plaintiff believed Defendant REDER, and, at this point, Plaintiff relied on Defendant REDER for a place to sleep each night and the ability to earn money. Plaintiff began to develop depression, anxiety, and the inability to concentrate.

96.     Defendant REDER increasingly pressured Plaintiff to drop out of high school and work for Defendant REDER full-time.  When Plaintiff told Defendant

REDER that Plaintiff could not work because Plaintiff had homework or other school-related obligations, Defendant REDER told Plaintiff that Plaintiff could obtain a GED later in life.

97.    Defendant REDER repeatedly assured Plaintiff that Defendant REDER would take care of and support Plaintiff, and Defendant REDER said he would help Plaintiff obtain employment at the other casinos and resorts in the area.  Defendant REDER then directed Plaintiff to withdraw from high school and falsely inform the school administration that Clamant would finish high school in Lake Tahoe.  Plaintiff complied because he felt beholden to Defendant REDER because Defendant REDER had provided Plaintiff with a job and housing.

98.    Defendant REDER violated the Trafficking Victims Protection Act when he coerced Plaintiff, a minor, into crossing state lines by enticing Plaintiff with the promise of employment, and coercing Plaintiff into quitting high school.

99.    Around May 20, 2013, Plaintiff contracted streptococcal pharyngitis, or strep throat, from Defendant REDER for the first time due to Defendant REDER pressuring and coercing Plaintiff to kiss and engage in oral sex with Defendant REDER.

100.    Around May 31, 2013, Plaintiff's sisters visited Plaintiff because they wanted to check in on him.  Defendant REDER arranged for Plaintiff's sisters to see a country music show and gave Plaintiff's sisters free tickets, but Defendant REDER avoided meeting Plaintiff's sisters.  Defendant REDER provided Plaintiff's sisters

with things like free tickets so Plaintiff's sisters would not be worried about Plaintiff or discover what Defendant REDER was subjecting Plaintiff to, ensuring Plaintiff would stay with Defendant REDER.

101.   Around June 20, 2013, Defendant REDER caused Plaintiff to contract strep, again, due to Defendant REDER pressuring and coercing Plaintiff to kiss and engage in oral sex with Defendant REDER.

102.   Around July 13, 2013, Defendant REDER caused Plaintiff to contract strep, again, due to Defendant REDER pressuring and coercing Plaintiff to kiss and engage in oral sex with Defendant REDER.

103.   Around July 20, 2013, Defendant REDER employed Plaintiff at the MontBleu Casino for Defendant REDER's recurring event named the Bass Camp Festival, run by Defendants PR, FESTIVAL, and MUSIC, all of which are owned by Defendant REDER. Plaintiff worked at the box office assisting with ticket sales, scanning tickets, and assisting with IT issues that arose.

104.   Around July 31, 2013, Defendant REDER invited Plaintiff to Defendant REDER's "39th" Birthday party.

105.   Around the end of September of 2013, Defendant REDER began researching ways Plaintiff could pass a hair follicle drug test so Plaintiff could obtain employment at other casinos.

106.   Around October 1, 2013, Defendant REDER crossed state lines with Plaintiff from NV to a hairdresser at the Imagine Salon in Lake Tahoe, CA where

Defendant REDER instructed a hairdresser to bleach Plaintiff's hair and dye

Plaintiff's hair with numerous chemicals.  Bleaching and dying Plaintiff's hair would

cause Plaintiff's hair to be so damaged that Plaintiff could pass a hair follicle drug test

so Plaintiff could work at the box office at other casinos.

107.   Defendant REDER employed different tactics to ensure Plaintiff

continued returning to Defendant REDER and relying on Defendant REDER for

different necessities that were in addition to the necessities of housing and

employment that Defendant REDER was already providing to Plaintiff.

108.   For example, a few months before Plaintiff's 18th birthday, Defendant

REDER made promises to Plaintiff that Defendant REDER would buy Plaintiff a car.

Defendant REDER made comments about buying Plaintiff a car for the purpose of

exciting Plaintiff and causing Plaintiff to do what Defendant REDER wanted in the

hopes of receiving a car.

109.   Around a couple of months before Plaintiff's 18th birthday, Defendant

REDER told Plaintiff that Defendant REDER would buy Plaintiff a cheap used car for

Plaintiff's 18th birthday, which was in July of 2013, but Defendant REDER never

bought Plaintiff a car.

110.   After Plaintiff's 18th birthday, Defendant REDER continued telling

Plaintiff that Defendant REDER would buy Plaintiff a car for $2,000 or $3,000 for

Christmas, but Defendant REDER did not buy Plaintiff a car. Instead, Defendant

REDER used Plaintiff's lack of transportation to continue using Plaintiff for sex.  For

example, Defendant REDER pressured and guilted Plaintiff into engaging in sexual acts with Defendant REDER in exchange for Defendant REDER giving Plaintiff rides or giving Plaintiff money for taxis and cabs.

111.   As another example, around December 13, 2013, Defendant REDER gifted Plaintiff a Walmart gift card for Christmas to purchase groceries. Many grocery stores were within walking-proximity of the casino Plaintiff lived in, but the nearest Walmart was a thirty-five-minute drive away. Defendant REDER chose gift cards from Walmart to ensure Plaintiff had no choice but to request assistance from Defendant REDER to obtain groceries by requesting money from Defendant REDER for a taxi or cab.

112.   Alternatively, Plaintiff used the little money he had to pay for a taxi or cab, which caused Plaintiff to be low on funds and forced Plaintiff to request money from Defendant REDER for other necessities. If Plaintiff asked Defendant REDER for any financial assistance, Defendant REDER coerced and forced Plaintiff to engage in sexual acts with Defendant REDER in exchange for financial assistance.

113.   Around December 31, 2013, Defendant REDER invited Plaintiff to one of Defendant REDER's DJ shows at the Horizon Casino where Defendant REDER provided Plaintiff a twenty-one and over wristband and numerous alcoholic beverages, despite the fact that Plaintiff was 18 years old.  During this event, Plaintiff overheard Defendant REDER tell a gift shop employee that Plaintiff was in debt to Defendant REDER for over $10,000, which was essentially a debt bondage, another

tactic employed by groomers and human traffickers.  By doing this, Defendant REDER further manipulated Plaintiff and now leveraged this debt, in addition to everything else, over Plaintiff.

114.   Around February 20, 2014, Defendant REDER, once again, invited Plaintiff to one of Defendant REDER's DJ shows where Defendant REDER provided Plaintiff a twenty-one and over wristband and numerous alcoholic beverages, despite the fact that Plaintiff was 18 years old.

115.   On one occasion, Defendant REDER was in Defendant REDER's car with his assistant, Duane Krzyzopolski (also known as Duane Suttor), when Plaintiff asked for money to pay for groceries.  Defendant REDER agreed and took cash from his wallet and extended his hand to Plaintiff.  When Plaintiff reached for the cash, Defendant REDER pulled his hand away before Plaintiff could take the cash and told Plaintiff, **_"Say 'thank you daddy.'"_**  Because Plaintiff needed the money, Plaintiff acquiesced, and Defendant REDER and Duane Suttor laughed at Plaintiff and drove away once Plaintiff took the money.

116.   Around the end of February/beginning of March of 2014, Defendant REDER started informing Plaintiff that Plaintiff needed to start looking for an apartment and that Defendant REDER would help Plaintiff find one.

117.   Around March of 2014, Defendant COLUMBIA SUSSEX's ownership of the Horizon Casino ended, and the new owners shut down the Horizon Casino for renovations to rebrand it as the Hard Rock Hotel & Casino Lake Tahoe.  The closure

of the Horizon Casino forced Plaintiff to move to a hotel room at the MontBleu Resort and Casino; Plaintiff's manager at the time helped Plaintiff obtain a room.

118.   Defendant REDER also told Plaintiff that once Defendant REDER's magic show ended that Defendant REDER would no longer have a job available to Plaintiff.  Defendant REDER's magic show ended around April 1, 2014, and Plaintiff stayed in Tahoe, NV for around two to four weeks after the Horizon Casino closed.

119.   Around this time, Plaintiff decided to separate himself from Defendant REDER and had various living arrangements between April and October of 2014, including Plaintiff living with Plaintiff's parents in Colfax, CA.

120.   When Plaintiff lived with Plaintiff's parents during this time period, due to Defendant REDER's grooming, Plaintiff picked fights with his parents because Plaintiff Defendant REDER groomed Plaintiff to believe that Plaintiff's parents were bad parents that could not help Plaintiff succeed in life, and that Defendant REDER was a better "parent" that took "better care" of Plaintiff.  Around this time, Defendant REDER had successfully turned Plaintiff against Plaintiff's own support system. Defendant REDER remained in contact with Plaintiff during this time period.

121.   Around June 13, 2014, Plaintiff was in Reno, Nevada with some friends when Defendant REDER messaged Plaintiff and asked why Plaintiff was in Reno. Defendant REDER then instructed Plaintiff to meet with Defendant REDER at a gay bar, in Reno, Nevada, and called Plaintiff a cab.

122.   Upon Plaintiff's arrival, Defendant REDER paid security to overlook

Plaintiff's ID, give Plaintiff a twenty-one and over wristband, and allow Plaintiff

entrance despite the fact that Plaintiff was only 18 years old at the time. Defendant

REDER proceeded to purchase Plaintiff drinks at a rapid pace, leaving Plaintiff

inebriated. Defendant REDER insisted Plaintiff dance on a table, despite Plaintiff's

intoxicated state, and stuck money in Plaintiff's pants, encouraging other adults in the

bar to do the same to Plaintiff. Plaintiff's friends called Plaintiff to check-on Plaintiff

and eventually picked up Plaintiff because Plaintiff was too intoxicated.  Plaintiff

could not walk straight and vomited on the way home due to the amount of alcohol

Defendant REDER gave to Plaintiff.

123.   Around August 2, 2014, Plaintiff attended a Lady Gaga concert at

Harvey's Casino in Lake Tahoe, Nevada, which was adjacent to the Horizon Casino; a

friend of Plaintiff's had invited Plaintiff and given Plaintiff a ticket.  Defendant

REDER had contacted Plaintiff and asked if Plaintiff was going.  Defendant REDER

provided Plaintiff gas money to attend the concert, as well as money for food, alcohol,

and marijuana for the event.

124.   When Plaintiff arrived at Harvey's Casino, Defendant REDER invited

Plaintiff to Defendant REDER's Recreational Vehicle (RV).  Defendant REDER and

his guests, all of whom were over the age of forty, plied Plaintiff with many alcoholic

beverages, despite Plaintiff being only eighteen years old at the time.  After Plaintiff

was inebriated, Defendant REDER escorted Plaintiff to the back room of the RV and

offered Plaintiff $300, which was a lot of money for Plaintiff at the time, in exchange

for allowing Defendant REDER to cuddle, kiss, and perform oral sex on Plaintiff.

125.   Defendant REDER violated the Trafficking Victims Protection Act when he coerced Plaintiff into crossing state lines by enticing Plaintiff to attend a concert and ultimately sexually assaulting and sexually battering Plaintiff as a result of the enticement.

126.   Around September 30, 2014, Plaintiff contacted Defendant REDER because Plaintiff had been in a fight with his stepdad and the fight had distressed Plaintiff.  Defendant REDER told Plaintiff that Plaintiff could move-in with Defendant REDER again, and Defendant REDER proceeded to purchase a train ticket and hotel room for Plaintiff to see Defendant REDER in Truckee, CA at The Truckee Hotel before starting the move.

127.   When Plaintiff arrived in Truckee, Defendant REDER told Plaintiff to never talk to his parents again if Plaintiff wanted further help from Defendant REDER.  Defendant REDER intended to move Plaintiff into Defendant REDER's home, and Defendant REDER took advantage of Plaintiff's argument with Plaintiff's stepdad and Plaintiff's heightened emotional state to coerce and persuade Plaintiff to move in with Defendant REDER again.

128.   Around October 1, 2014, Defendant REDER and his assistant Duane Krzyzopolski arrived at the Truckee Hotel and moved Plaintiff and Plaintiff's belongings to Defendant REDER's home in Zephyr Cove, Nevada.

129.   Defendant REDER assured Plaintiff that Defendant REDER intended to

assist Plaintiff in acquiring Plaintiff's own apartment.  Defendant REDER told

Plaintiff that Defendant REDER had a new show debuting soon and could employ

Plaintiff at Defendant REDER's upcoming raves.  Defendant REDER, once again,

used promises of housing and employment to manipulate and coerce Plaintiff into

crossing state-lines for Defendant REDER for Defendant REDER to take sexual

advantage of Plaintiff.

130.   Around October 2, 2014, Defendant REDER transported Plaintiff to

Reno, Nevada, where Defendant REDER employed Plaintiff at a rave that featured the

artist Diplo. Defendants REDER, PR, PRE, PRE P, FESTIVAL, and MUSIC

organized and produced the rave. Defendant REDER, once again, provided Plaintiff

with a twenty-one and over wristband and numerous alcoholic beverages and

marijuana, despite the fact that Plaintiff was only 18 years old.  Defendant REDER

did not pay Plaintiff for working the event.

131.   Later that night, Defendant REDER informed Plaintiff that Defendant

REDER had booked only one room for the night and told Plaintiff if Plaintiff did not

want to stay in the room with Defendant REDER that Plaintiff would need "to figure

something else out."  Defendant REDER created another situation in which Plaintiff

had no choice but to share a room and bed with Defendant REDER.

132.   When Plaintiff and Defendant REDER were in the hotel room, Defendant

REDER coerced and pressured Plaintiff to kiss and engage in oral sex with Defendant

REDER until Plaintiff acquiesced.  Plaintiff was inebriated because Defendant

REDER had provided Plaintiff with a 21+ wristband, which allowed Defendant REDER to more easily pressure Plaintiff until Plaintiff acquiesced.

133.   Defendant REDER harassed Plaintiff because of his sex, gender, and sexual orientation, and created a hostile work environment for Plaintiff.

134.   On each occasion wherein Defendant REDER transported Plaintiff to Reno, Nevada to work an event, Defendant REDER made sexual advances toward Plaintiff each time Plaintiff they were alone together. Defendant REDER repeatedly attempted to kiss Plaintiff on the lips, and Plaintiff rebuffed Defendant REDER's incessant predatory sexual advances.

135.   Defendant REDER harassed Plaintiff because of his sex, gender, and sexual orientation, and created a hostile work environment for Plaintiff.

136.   Defendant REDER engaged in Quid Pro Quo sexual harassment each time he provided Plaintiff with a job opportunity in exchange for sexual favors from Plaintiff.

137.   Around this time, Defendant REDER expected sexual compliance from Plaintiff any time Plaintiff asked for anything such as money for groceries or other necessities.

138.   Defendant REDER violated the Trafficking Victims Protection Act when he coerced Plaintiff into crossing state lines by enticing Plaintiff with the promise of employment.

139.   Around October of 2014, instead of Plaintiff living with Defendant

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REDER as Defendant REDER had promised Plaintiff, Defendant REDER moved Plaintiff between Defendant REDER's home and Defendant REDER's RV.

140.   Defendant REDER first parked the RV in a camping spot at the Zephyr Cove RV Campground.  After Defendant REDER had parked the RV in the campground for some time, Defendant REDER told Plaintiff it was too expensive parking the RV at the campground.  Defendant REDER then made arrangements with the owners of Kingsbury Self Storage (Storwise Storage) to park the RV in front of the business and run an extension cord to the RV for power.

141.   When Plaintiff was living in the RV and parked in front of Kingsbury, Defendant REDER and the owner of Kingsbury required Plaintiff to keep the lights off and make no noise in the evening so Plaintiff would not be found living in the RV by the police.  Defendant REDER generally forced Plaintiff to live in the RV whenever anyone visited Defendant REDER.

142.   During the times Plaintiff lived in the RV, Defendant REDER repeatedly left Plaintiff without heat during snowstorms, and Plaintiff experienced flooding on any occasion wherein Plaintiff attempted to shower or use the toilet or sink.  The electronic breaker at Kingsbury blew every time Plaintiff tried to use the heater, and the blown breaker prevented Plaintiff from using the RV's microwave or stove.  The breaker issue also caused Plaintiff to sleep without heat on nights of heavy snow at least several times a week.

143.   During the time Plaintiff lived with Defendant REDER, Defendant

REDER moved Plaintiff between Defendant ROGERS' couch (one of Defendant

REDER's employees), Defendant REDER's RV, and various hotels where Defendant

REDER knew hotel management that could provide Defendant REDER free rooms in

exchange for tickets to Defendant REDER's shows.  Plaintiff moved between these

different living arrangements for around one year.

144.   On several occasions, Defendant REDER instructed Defendant

ROGERS, one of the event coordinators for Defendants FESTIVAL and MUSIC, to

provide a place for Plaintiff to sleep when Defendant REDER's family or sister were

in town.  Defendant REDER also instructed Defendant ROGERS to provide Plaintiff

with rides when Defendant REDER needed Plaintiff to perform work. Defendant

ROGERS also provided Defendant REDER with drugs like cocaine, various forms of

methylenedioxymethamphetamine ("MDMA"), marijuana, and psilocybin (magic

mushrooms), which Defendant REDER sometimes pressured Plaintiff to take.

145.   On multiple occasions while in the presence of either Duane Suttor or

Defendant ROGERS, Defendant REDER made comments that Plaintiff was like

Defendant REDER's son now or that Defendant REDER had essentially adopted

Plaintiff as his child.

146.   On several occasions, Defendant REDER instructed Defendant ROGERS

to take Plaintiff to the hospital after Defendant REDER had caused Plaintiff to

contract a urinary tract infection and/or strep throat.

147.   Around October 17, 2014, Defendant REDER transported Plaintiff to

Reno, Nevada to work yet another rave event, called SAFE IN SOUND. Defendants

REDER, PR, PRE, PRE P, FESTIVAL, and MUSIC organized and produced the

event. Defendant REDER, once again, provided Plaintiff with a twenty-one and over

wristband and numerous alcoholic beverages and marijuana, despite the fact that

Plaintiff was only eighteen years old.

148.   During this event, Plaintiff met Defendant REDER's niece, Defendant

CAROLYN.  While they were talking, Defendant CAROLYN told Plaintiff, "***You're***

***not gonna get my uncle in trouble are you?  Another boy tried to get him in trouble***

***and we had to take care of him***."  Plaintiff was shocked that Defendant CAROLYN

said this to him and did not know how to respond.  By telling Plaintiff this, Defendant

CAROLYN attempted to prevent, silence, and stop Plaintiff from complaining about

the sexual battery, assault, and sex trafficking that Defendant REDER subjected him

to.  It also shows how multiple people, including Defendant CAROLYN were aware

of or knew of Defendant REDER's history of grooming, manipulating, sexually

battering, sexually assaulting, and sexually trafficking young men.

149.   Later that night, Defendant REDER informed Plaintiff that Defendant

REDER had, once again, booked only one room for the night and created a situation

in which Plaintiff had no choice but to share a room and bed with Defendant REDER.

150.   When Plaintiff and Defendant REDER were in the hotel room, Defendant

REDER coerced and pressured Plaintiff to kiss and engage in oral sex with Defendant

REDER until Plaintiff acquiesced.  Plaintiff was inebriated because Defendant

REDER had provided Plaintiff with a 21+ wristband, which allowed Defendant REDER to more easily pressure Plaintiff until Plaintiff acquiesced.

151.   Defendant REDER harassed Plaintiff because of his sex, gender, and sexual orientation, and created a hostile work environment for Plaintiff.

152.   Defendant REDER harassed Plaintiff because of his sex, gender, and sexual orientation, and created a hostile work environment for Plaintiff.

153.   Defendant REDER engaged in Quid Pro Quo sexual harassment each time he provided Plaintiff with a job opportunity in exchange for sexual favors from Plaintiff.

154.   Around November 1, 2014, Defendant REDER transported Plaintiff to Reno, Nevada to work at yet another rave event.  Defendants REDER, PR, FESTIVAL, and MUSIC organized and produced the event. Defendant REDER, once again, provided Plaintiff with a twenty-one and over wristband and numerous alcoholic beverages and marijuana, despite the fact that Plaintiff was only eighteen years old.

155.   Later that night, Defendant REDER informed Plaintiff that Defendant REDER had, once again, booked only one room for the night. Defendant REDER created another situation in which Plaintiff had no choice but to share a room and bed with Defendant REDER.

156.   When Plaintiff and Defendant REDER were in the hotel room, Defendant REDER coerced and pressured Plaintiff to kiss and engage in oral sex with Defendant

REDER until Plaintiff acquiesced.  Plaintiff was inebriated because Defendant REDER had provided Plaintiff with a 21+ wristband, which allowed Defendant REDER to more easily pressure Plaintiff until Plaintiff acquiesced.

157.   Defendant REDER harassed Plaintiff because of his sex, gender, and sexual orientation, and created a hostile work environment for Plaintiff.

158.   Defendant REDER harassed Plaintiff because of his sex, gender, and sexual orientation, and created a hostile work environment for Plaintiff.

159.   Defendant REDER engaged in Quid Pro Quo sexual harassment each time he provided Plaintiff with a job opportunity in exchange for sexual favors from Plaintiff.

160.   Around November 22, 2014, Defendant REDER coerced Plaintiff into ingesting a non-prescribed tablet of Xanax before coercing Plaintiff into cuddling with Defendant REDER. Defendant REDER eventually fell asleep, and Plaintiff took the opportunity to leave Defendant REDER's home so Plaintiff could have some space and time away from Defendant REDER.  Plaintiff walked for twenty-five minutes in the snow to reach a bus stop, and Plaintiff visited a friend for a day before returning to Defendant REDER's home where all of Plaintiff's belongings were.

161.   Defendant REDER sexually assaulted and sexually battered Plaintiff.

162.   Around this time, Plaintiff learned that Defendant REDER was actually 49 years old, and not 39-years old, as Defendant REDER had been claiming.  The revelation informed Plaintiff that Defendant REDER was actually thirty-one years

older than Plaintiff, not nineteen years older, as Defendant REDER had claimed. Plaintiff learned Defendant REDER's real age after Plaintiff saw a copy of Defendant REDER's driver's license.

163.    Around December 15, 2014, Defendant REDER required Plaintiff remove all of Plaintiff's belongings from Defendant REDER's home and stay in a hotel while Defendant REDER hosted and entertained a young boy named Jake; Jake appeared to be sixteen or seventeen years old, but Plaintiff believed Jake had recently turned eighteen.  Defendant REDER shared with Plaintiff that Defendant REDER met Jake at the Serenity Spa where Jake had been Defendant REDER's massage therapist, and that Defendant REDER often paid Jake not only for massages but also sexual favors.

164.    When Defendant REDER allowed Plaintiff to return after Jake had left, Plaintiff found underwear hung on Plaintiff's doorknob, indicating to Plaintiff that Defendant REDER and Jake had sexual intercourse in Plaintiff's room and bed.

165.    On one occasion, Plaintiff was in Defendant REDER's home and Defendant REDER gave Plaintiff marijuana.  After they smoked marijuana, Defendant REDER asked Plaintiff if Plaintiff would kiss Defendant REDER and engage in oral sex with Defendant REDER in exchange for money.  Because Plaintiff did not have consistent employment, Plaintiff had no choice but to acquiesce.  After Defendant REDER and Plaintiff engaged in oral sex, Defendant REDER put $200 on the nightstand and said, "Is this enough?" as if Plaintiff was a prostitute and left the room.

166.   On one occasion in 2014, Defendant REDER was crying.  When Plaintiff asked Defendant REDER what was wrong, Defendant REDER told Plaintiff that Defendant REDER was sad because another young boy had ended their relationship with Defendant REDER and Defendant REDER was worried that Defendant REDER would end up alone.  Defendant REDER said he wanted someone to marry Defendant REDER so Defendant REDER could spoil them and allow them to use his cars and houses. In return, Defendant REDER wanted whomever he married to do the laundry and dishes.  Defendant REDER then asked Plaintiff if Plaintiff ever wanted to marry someone one day, to which Plaintiff said no.

167.   After Plaintiff stated that Plaintiff did not want to get married, Defendant REDER proceeded to tell Plaintiff that Defendant REDER wanted a permanent "houseboy" to perform chores like cleaning and laundry for Defendant REDER.  A "houseboy" is typically a young attractive boy that lives with the property owner and performs chores for the property owner while either nude or dressed provocatively. "Houseboys" also engage in sexual activity with the property owner.  Defendant REDER's comments about wanting a "houseboy" showed Defendant REDER's true intentions for Plaintiff.

168.   Between 2014 and 2016, Defendant REDER sexually assaulted and sexually battered Plaintiff in Defendant REDER's hot tub on at least five occasions. On each of these occasions, Defendant REDER pressured Plaintiff to join Defendant REDER in Defendant REDER's hot tub in the nude.  Once Plaintiff entered the hot

tub, Defendant REDER pressured and coerced Plaintiff into kissing Defendant REDER.  Defendant REDER would then instruct Plaintiff to stand up while Defendant REDER forcibly performed oral sex on Plaintiff while Defendant REDER sat down.  Defendant REDER then instructed Plaintiff to perform oral sex on Defendant REDER until Defendant REDER orgasmed.  Plaintiff acquiesced each time because Plaintiff feared Defendant REDER would terminate Plaintiff or evict Plaintiff.

169.   Around January 2, 2015, Defendant REDER connected Plaintiff with Morgan, an employee and Supervisor/Manager for Wells Fargo, and family friend of Defendant REDER.  Morgan helped Plaintiff obtain a job at Wells Fargo where Morgan had the ability to hire Plaintiff as a bank teller.

170.   Morgan knew of the sexual relationship between Plaintiff and Defendant REDER, but Morgan did not say anything because she felt indebted to Defendant REDER due to Defendant REDER providing Morgan with VIP concert tickets, backstage passes, meet and greets with celebrities, hotel rooms, and the like.  Morgan also viewed Defendant REDER like an uncle because her father had known Defendant REDER since Morgan was a child.

171.   On at least seven occasions during Plaintiff's employment with Wells Fargo, Plaintiff went to Morgan's office and cried until Plaintiff could cry no more because Plaintiff was distraught from being unable to escape Defendant REDER.

172.   On one occasion when Plaintiff was in Morgan's office, Morgan told

Plaintiff, "we weren't even gonna hire you, there was someone else more qualified, but I did it because of [Defendant REDER."

173.   Around April 9, 2015, Defendant REDER caused Plaintiff to contract strep, again, due to Defendant REDER pressuring and coercing Plaintiff to kiss and engage in oral sex with Defendant REDER.

174.   Around April 18, 2015, Defendant REDER transported Plaintiff to Reno, Nevada to work at a concert event named "Spring Breaks 2."  Defendant REDER and Defendants PR, FESTIVAL, and MUSIC organized and produced the event. Defendant REDER, once again, provided Plaintiff with a twenty-one and over wristband and numerous alcoholic beverages and marijuana, despite the fact that Plaintiff was only nineteen years old.

175.   On this particular occasion, Defendant REDER provided Plaintiff with Plaintiff's own hotel room and did not force Plaintiff to share a room with Defendant REDER.  However, Defendant REDER repeatedly pressured Plaintiff throughout the night to sleep in Defendant REDER'S room.

176.   Defendant REDER harassed Plaintiff because of his sex, gender, and sexual orientation, and created a hostile work environment for Plaintiff.

177.   Defendant REDER harassed Plaintiff because of his sex, gender, and sexual orientation, and created a hostile work environment for Plaintiff.

178.   Defendant REDER engaged in Quid Pro Quo sexual harassment each time he provided Plaintiff with a job opportunity and expected sexual favors from

Plaintiff.

179.   Later that night, during the event, Defendant REDER grabbed Plaintiff and forcibly kissed Plaintiff on the lips while they were in the crowd. For the remainder of the night, Defendant REDER continued pressuring Plaintiff to stay in Defendant REDER's hotel room.  Plaintiff repeatedly rebuffed Defendant REDER's advances.

180.   Defendant REDER sexually assaulted and sexually battered Plaintiff.

181.   Around April 24, 2015, Defendant REDER caused Plaintiff to contract strep, again, due to Defendant REDER pressuring and coercing Plaintiff to kiss and engage in oral sex with Defendant REDER.

182.   Around April 29, 2015, Defendant REDER transported Plaintiff to Reno, Nevada to work at a concert event featuring Paris Blohm.  Defendants REDER, PR, FESTIVAL, and MUSIC organized and produced the event.  Defendant REDER, once again, provided Plaintiff with a twenty-one and over wristband and numerous alcoholic beverages, despite the fact that Plaintiff was only nineteen years old. Defendant REDER also provided Plaintiff with a twenty-one and over wristband to enter Defendant COLUMBIA SUSSEX's new nightclub named Vinyl.

183.   Around May 4, 2015, Plaintiff requested assistance from Defendant REDER to pay Plaintiff's phone bill. At the time, Plaintiff required an operating phone in order to schedule doctor's appointments, stay connected with Plaintiff's family, and organize a place to sleep each night. Defendant REDER requested

Plaintiff's phone service login information and told Plaintiff, "Daddy will take care of you." Plaintiff attempted to laugh off Plaintiff's discomfort, to which Defendant REDER stated, "I think you need to pay me interest ;)," implying that Defendant REDER expected intimacy with Plaintiff as "repayment" and "interest." Plaintiff attempted to rebuff Defendant REDER's implicit sexual advances by claiming Plaintiff was sick. Because Plaintiff did not entertain Defendant REDER's sexual advances, Defendant REDER ignored Plaintiff until Plaintiff followed up about the phone payment.

184.   Around May 13, 2015, Plaintiff contracted strep throat from Defendant REDER, again, due to Defendant REDER pressuring and coercing Plaintiff to kiss and engage in oral sex with Defendant REDER.

185.   On multiple occasions in 2015, Plaintiff experienced tooth pain and used his tooth pain as an excuse to tell Defendant REDER that Plaintiff was unable to perform oral sex on Defendant REDER.  Unhappy that Plaintiff was unable to perform oral sex, Defendant REDER pressured Plaintiff into seeing a dentist.  Around June 30, 2015, a dentist determined that Plaintiff had an abscess on one of his wisdom teeth. Around July 7, 2015, Defendant REDER paid to have Plaintiff's wisdom teeth removed to ensure that Plaintiff could continue performing oral sex on Defendant REDER.

186.   Around November 11, 2015, Plaintiff was forced to quit Plaintiff's job as a Bank Teller at Wells Fargo. Throughout Plaintiff's employment at Wells Fargo,

Plaintiff began developing PTSD symptoms and consistently experienced bouts of depression, severe anxiety, mood swings, loss of train of thought, sudden and unexpected vision changes, and uncontrollable crying spells. Plaintiff's symptoms prevented Plaintiff from performing Plaintiff's job duties and Plaintiff was forced to quit. Following this, Plaintiff struggled to find and maintain a job as a result of the symptoms Plaintiff experienced because of Defendant REDER's continuous and deliberately predatory actions toward Plaintiff.

187.   Around February 7, 2016, Defendant REDER employed Plaintiff to work at a concert event called Winter Whiteout, featuring the artist JAUZ. Defendants REDER, PR, FESTIVAL, and MUSIC organized and produced the event. Defendant REDER, once again, provided Plaintiff with a twenty-one and over wristband and numerous alcoholic beverages and marijuana, despite the fact that Plaintiff was only twenty years old at the time.

188.   Around February 9, 2016, Plaintiff requested assistance from Defendant REDER to purchase groceries. Defendant REDER transferred Plaintiff money and told Plaintiff that Plaintiff now "owed [Defendant REDER] interest," once again, implying that Defendant REDER expected Plaintiff to repay Defendant REDER with sexual favors.

189.   Around February 24, 2016, Plaintiff requested assistance from Defendant REDER to pay Plaintiff's car insurance bill, and Defendant REDER requested Plaintiff's presence in Defendant REDER's office at The Loft; The Loft was the name

for Defendant REDER's business and was located in a suite in the Heavenly Village in California.  Plaintiff needed to travel across state lines from Nevada to California to go to The Loft.

190.    Defendants REDER, STEGEMILLER, PRE and PRE P own The Loft.

191.    Upon Plaintiff's arrival at Defendant REDER's office, Defendant REDER closed and locked the door, and told Plaintiff that Defendant REDER would help Plaintiff if Plaintiff *"earned"* the money by kissing and making out with Defendant REDER.  Defendant REDER's office did not have any windows or exits, other than the one door Plaintiff entered through.  Plaintiff acquiesced because he felt he did not have a choice and did not have an exit.

192.    Defendant REDER harassed Plaintiff because of his sex, gender, and sexual orientation, and created a hostile work environment for Plaintiff.

193.    Defendant REDER engaged in Quid Pro Quo sexual harassment by offering to help Plaintiff in exchange for sexual favors.

194.    Defendant REDER sexually assaulted and sexually battered Plaintiff.

195.    Defendant REDER falsely imprisoned Plaintiff.

196.    After Defendant REDER coerced Plaintiff into engaging in sexual activity with Defendant REDER, Defendant REDER transferred $100 to Plaintiff's account.

197.    Defendant STEGEMILLER was engaged in business with Defendant REDER for sometime before and throughout the entire time Plaintiff worked for

Defendants. Defendant STEGEMILLER knew or should have known that Defendant REDER was sexually trafficking and forcing Plaintiff to engage in commercial sex acts. By using Plaintiff, Defendant STEGEMILLER and the companies he co-owned with Defendant REDER profited off of the commercial sex acts, assaults, and batteries, that Defendant REDER subjected Plaintiff to.

198.   Defendant STEGEMILLER was aware that Defendant REDER took Plaintiff into Defendant REDER's office unsupervised.

199.   As a result of Plaintiff's inability to find and maintain employment outside of Plaintiff's employment with Defendant REDER, Plaintiff devised a plan to help himself finally escape Defendant REDER's predatory sexual harassment, sexual assault, and sexual battery of Plaintiff. During this time, Plaintiff sold box office tickets for Defendant REDER's events for cash in order to pocket small amounts of money, allowing Plaintiff to finally save money and permanently escape Defendant REDER's predacious actions. Plaintiff continued this for roughly one month.

200.   Around March 30, 2016, Defendant REDER summoned Plaintiff into Defendant REDER's office at The Loft. When Plaintiff arrived, Defendant REDER asked Plaintiff, ***"Is there anything you would like to tell me?"*** Defendant REDER informed Plaintiff that Defendant REDER became aware that Plaintiff took funds while working for Defendant REDER and Defendant REDER claimed he had video evidence. Defendant REDER also claimed that Defendant STEGEMILLER wanted to call the police and have Plaintiff arrested for embezzlement. Plaintiff cried profusely,

and said, "I just don't want to be here anymore." Plaintiff could no longer withstand Defendant REDER requiring sexual compliance from Plaintiff each time Plaintiff needed help or assistance, and Plaintiff could no longer withstand telling Defendant REDER "no," which led to Defendant REDER punishing Plaintiff by doing things such as cutting Plaintiff's hours at work so Plaintiff could not afford necessities, doctor's visits, or medical prescriptions. Defendant REDER, now angry, told Plaintiff, "I hope you saved the money because you are going to need it."

201.    Defendant REDER used the threat of jail and the police to silence Plaintiff and manipulate Plaintiff into believing that Plaintiff would be in trouble if Plaintiff reported any of the illegal acts committed by Defendant REDER.

202.    Around the same day, Defendants REDER, PR, PRE, PRE P, FESTIVAL, and MUSIC wrongfully terminated Plaintiff.

203.    Following Defendant REDER's termination of Plaintiff, Defendant REDER required Plaintiff to follow Defendant REDER to his home in Zephyr Cove, Nevada, to collect Plaintiff's belongings. While Plaintiff collected Plaintiff's things, Defendant REDER admonished and shamed Plaintiff stating, "you're fucked up in the head." Defendant REDER left Plaintiff homeless and jobless for two months after terminating and evicting Plaintiff.

204.    At all times material between 2013 and 2016, Defendant WEINER owned the Zephyr Cove, NV property detailed in this complaint and rented and/or leased the property to her brother, Defendant REDER. Defendant WEINER was also

aware that Defendant REDER brought young-looking boys to the property throughout this time due to Defendant REDER posting about the young-looking boys he was dating on his social media accounts. Defendant WEINER knew, or should have known, that Defendant REDER was using her property to manipulate, groom, human traffic, sexual assault, and sexually batter Plaintiff. Defendant WEINER profited off of the rent and/or lease payments that Defendant REDER provided to her in his scheme to traffick young men to Defendant WEINER's homes and properties.

205.   Defendant WEINER knew or should have know about Defendant REDER's illegal conduct and that he was using her properties to engage in that conduct.  Despite this, Defendant WEINER, allowed it to continue, and facilitated it by taking zero corrective action allowing for not only Defendant REDER to financially benefit off of the sex trafficking of Plaintiff, but for Defendant WEINER to as well.

206.   Throughout Plaintiff's employment with Defendant REDER, on about thirty-eight occasions, Plaintiff dealt with serious medical injuries as a result of Defendant REDER's predatory sexual harassment, sexual assault, and sexual battery of Plaintiff. Plaintiff contracted and suffered numerous bouts of strep throat, sinus infections, and bladder infections. Plaintiff's numerous bladder infections consequently caused Plaintiff to be hospitalized due to Plaintiff's inability to urinate, requiring catheterization to ensure Plaintiff did not experience kidney failure. Plaintiff has and will continue to experience these negative health effects in Los Angeles, CA.

207.   Around the beginning of 2023, Plaintiff learned that Defendant REDER was tracking Plaintiff by contacting one of Plaintiff's sisters and asking about Plaintiff. Plaintiff was and is residing in Los Angeles, CA at the time Defendant REDER contacted Plaintiff's sisters.

208.   Defendant REDER harassed Plaintiff because of his sex, gender, and sexual orientation, and created a hostile work environment for Plaintiff.

209.   Defendant REDER engaged in Quid Pro Quo sexual harassment each time he provided Plaintiff with a job opportunity in exchange for sexual favors from Plaintiff.

210.   Defendant REDER violated the Trafficking Victims Protection Act each time he coerced Plaintiff into crossing state lines by enticing Plaintiff with the promise of employment.

211.   Defendant REDER violated the Sexual Abuse and Cover Up Accountability Act each time he sexually assaulted and sexually battered Plaintiff and covered up the sexual battery and sexual assault by lying about his relationship with Plaintiff, telling Plaintiff to lie about Defendant REDER's relationship to Plaintiff, and terminating Plaintiff, among the other acts described above.

212.   Because of the acts and conduct complained of herein, Plaintiff has suffered from and continues to suffer from urinary restriction, a voiding dysfunction (urinary retention), dissociation, disorderly eating, self-mutilation, severe mood swings, severe anxiety, severe depression, and paranoia. Plaintiff has been diagnosed

with and suffers from Post-Traumatic Stress Disorder, Borderline Personality Disorder, Chronic Depression, and Generalized Anxiety Disorder.

213.   As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages against Defendants.

214.   Plaintiff claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

215.   Plaintiff further claims aggravation, activation, and/or exacerbation of any preexisting conditions as a result of Defendants' discriminatory conduct.

216.   Plaintiff claims alternatively (in the event Defendant Claims so or that the Court determines) that Plaintiff is an Independent Contractor, Volunteer, or Applicant, and Plaintiff makes all applicable claims for the above conduct and facts under the applicable laws pertaining to Independent Contractors, volunteers, or applicants.

217.   Furthermore, in such case, Plaintiff claims that Defendant owed and breached its duty to Plaintiff to prevent the harassment/discrimination/retaliation and is liable therefore for negligence.

218.   The above are just some of the examples of the unlawful discrimination and disparate treatment to which the Defendants subjected the Plaintiff on a continuous and on-going basis throughout Plaintiff's employment.

# **FIRST CAUSE OF ACTION**

## **TRAFFICKING VICTIMS' PROTECTION ACT (TVPA)**

(Against Defendants PR, PRE, PRE P, MUSIC, FESTIVAL, COLUMBIA SUSSEX,

COLUMBIA SUSSEX MANAGEMENT, REDER, WEINER, STEGEMILLER, and

ROGERS)

219.   Plaintiff incorporates by reference and re-alleges the preceding

paragraphs, as though fully stated herein.

220.   In addition to what is stated above, Defendants PR, PRE, PRE P,

MUSIC, FESTIVAL, COLUMBIA SUSSEX, COLUMBIA SUSSEX

MANAGEMENT, REDER, STEGEMILLER and ROGERS engaged in interstate

commerce as described herein through, inter alia, their use of the internet, phones, text

messages, advertising, promotion, transportation of Plaintiff, and production of

entertainment events, raves, and concerts. Defendant WEINER owned the property in

which a substantial number of the alleged acts took place, and Defendant WEINER

knew or should have known that her property was being used to commit such alleged

acts.

221.   Furthermore, the above position and employment Defendants used to

entice Plaintiff for sex acts was a position which would have taken and did take

Plaintiff across state lines for different events which Defendants would have and do

profit from.

222.   Defendants, in effecting interstate commerce by producing, running, and

creating an event and concert-producing company, and through the enticement, solicitation, transportation, and recruitment of Plaintiff across interstate lines through the use of a phone application, enticed, coerced, solicited, and recruited Plaintiff to travel with Defendants and be sexually assaulted and battered by Defendants in exchange for housing and employment at various concerts and raves that took place in multiple states.

223.   Defendants enticed, coerced, transported, solicited, and recruited Plaintiff for the employment position and committed the sexual assault and battery on Plaintiff by force, fraud, and coercion.

224.   During Plaintiff's employment with Defendants, Defendants also transported and harbored Plaintiff's person in various homes, hotels, motels, and recreational vehicles in multiple states.

225.   Thereafter, because Plaintiff was not a willing and enthusiastic participant in the sexual harassment, assault and battery, Defendants solicited Plaintiff to engage in sexual acts against Plaintiff's will and through fraud and coercion; Defendants then ultimately terminated Plaintiff.

226.   Through Defendant REDER's sexual assault and battery, Defendants, including Defendants PR, PRE, PRE P, MUSIC, FESTIVAL, COLUMBIA SUSSEX, COLUMBIA SUSSEX MANAGEMENT, REDER, STEGEMILLER, and ROGERS have profited and obtained revenue from Plaintiff, and would have continued to profit and obtain revenue if they continued to employ Plaintiff.  It was Defendants' common

scheme and plan to profit from the exploitation of Plaintiff by using him for sexual acts while taking Plaintiff to various concert events for employment.

227.   During some of the acts described above, Plaintiff was under the age of 18.

228.   Plaintiff brings this claim pursuant to all applicable sections of 18 U.S.C.A. §§ 1591, 1595 in that "An individual who is a victim of a violation of Section 1589, 1590, or 1591 of title 18, United States Code, may bring a civil action in any appropriate district court of the United States. The court may award actual damages, punitive damages, reasonable attorneys' fees, and other litigation costs reasonably incurred." 18 U.S.C.A. §1595(a).

229.   18 USC § 1591. Sex trafficking of children or by force, fraud, or coercion states as follows:

(a) Whoever knowingly--
(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).
(b) The punishment for an offense under subsection (a) is--
(1) if the offense was effected by means of force, threats of force, fraud, or coercion described in subsection (e)(2), or by any combination of such means, or

if the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had not attained the age of 14 years at the time of such offense, by a fine under this title and imprisonment for any term of years not less than 15 or for life; or

**(2)** if the offense was not so effected, and the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had attained the age of 14 years but had not attained the age of 18 years at the time of such offense, by a fine under this title and imprisonment for not less than 10 years or for life.

**(c)** In a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited, the Government need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years.

**(d)** Whoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be fined under this title, imprisoned for a term not to exceed 25 years, or both.

**(e)** In this section:

**(1)** The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

**(2)** The term "coercion" means--

**(A)** threats of serious harm to or physical restraint against any person;

**(B)** any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

**(C)** the abuse or threatened abuse of law or the legal process.

**(3)** The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.

**(4)** The term "participation in a venture" means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1).

**(5)** The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

**(6)** The term "venture" means any group of two or more individuals associated in fact whether or not a legal entity

230.   Additionally, 18 USCA § 1595. Civil remedy states as follows:

(a) An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.
(b)(1) Any civil action filed under subsection (a) shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the Plaintiff is the victim.
(2) In this subsection, a "criminal action" includes investigation and prosecution and is pending until final adjudication in the trial court.
(c) No action may be maintained under subsection (a) unless it is commenced not later than the later of--
(1) 10 years after the cause of action arose; or
(2) 10 years after the victim reaches 18 years of age, if the victim was a minor at the time of the alleged offense

231.   Broad, expansive language is employed in Trafficking Victims Protection Act (TVPA) and its remedial provision, which permits civil actions for damages under TVPA. *Noble v Weinstein*, 335 F Supp 3d 504 [SDNY 2018], mot to certify appeal denied, 17-CV-09260 (AJN), 2019 WL 3940125 [SDNY Aug. 5, 2019].

232.   Defendants subjected Plaintiffs to commercial sex acts by force and coercion, including both physical and financial.

233.   18 U.S.C. 1591 § (e)(3) defines a "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person."

234.   A commercial sex act means any sex act, on account of which anything of value is given to or received by any person. The specific conditions are the use of force, fraud, or coercion, or conduct involving persons under the age of 18. See the Department of Justice's definition: https://www.justice.gov/crt/involuntary-servitude-

– 60 –

forced-labor-and-sex-trafficking-statutesenforced. "Section 1591 criminalizes sex

trafficking, which is defined as causing a person to engage in a commercial sex act

under certain statutorily enumerated conditions. A commercial sex act means any sex

act, on account of which anything of value is given to or received by any person. The

specific conditions are the use of force, fraud, or coercion, or conduct involving

persons under the age of 18."

235.   Section 1595 of Title 18 gives any "individual who is a victim" of a

violation of - among other provisions - Section 1591 the right to bring a civil action

against "the perpetrator" or "whoever knowingly benefits, financially or by receiving

anything of value from participation in a venture which that person knew or should

have known has engaged in an act in violation of' Section 1591.  Defendants WEINER

and ROGERS knew or should have known that they were receiving financial benefits

and value in their participation with Defendant REDER's sex trafficking of Plaintiff.

236.   Defendants conditioned Plaintiff's employment on Defendants' ability to

continue to sexually assault and engage in forced sex acts with Plaintiff. Additionally,

the financial aspect to the relationship was a key element of the "forced" sex acts in

that Defendants withheld financial assistance from Plaintiff until Plaintiff engaged in

the described sex acts and used the promise of employment and financial stability to

entice, solicit, and coerce Plaintiff into engaging in the described sex acts.

237.   Defendants knowingly recruited, enticed, harbored, and/or obtained

Plaintiff through means of force, threats of force, and by a combination of such

forceful means, and forcibly caused Plaintiff to engage in an unwanted sexual act for a commercial benefit.

238.   Defendants COLUMBIA SUSSEX and COLUMBIA SUSSEX MANAGEMENT knew, or should have known, through their employees, such as Corinna Osborne, that Defendant REDER utilized the Horizon in his scheme to recruit, entice, harbor, and/or obtain Plaintiff through means of force, threats of force, and/or by a combination of such forceful means, and forcibly cause Plaintiff to engage in an unwanted sexual acts for a commercial benefit.

239.   18 USC 1594 further provides liability for "Whoever conspires with another to violate section 1591" Defendants further conspired to violate 1591 as stated herein.

240.   18 USC 1594 further states that it shall be unlawful for anyone who "obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section." Assuming Defendants take such retaliatory action as stated above, Plaintiff makes a claim for such.

241.   Defendants are liable to Plaintiffs under 18 USCA § 1591, 1594 and 1595.

//

//

//

//

# SECOND CAUSE OF ACTION

## VIOLATIONS OF THE SEXUAL ABUSE AND COVER UP ACCOUNTABILITY ACT

(Against Defendants(Against Defendants PR, PRE, PRE P, MUSIC, FESTIVAL, COLUMBIA SUSSEX, COLUMBIA SUSSEX MANAGEMENT, REDER, and CAROLYN)

242.    Plaintiff incorporates by reference and re-alleges the preceding paragraphs, as though fully stated herein.

243.    In addition to what is stated above, Plaintiff brings this claim pursuant to all applicable sections of CCP § 340.16, including CCP § 340.16(a)(1), which states, "[i]n any civil action for recovery of damages suffered as a result of sexual assault, where the assault occurred on or after the plaintiff's 18th birthday, the time for commencement of the action shall be . . . Within 10 years from the date of the last act, attempted act, or assault with the intent to commit an act, of sexual assault against the plaintiff," and CCP § 340.16(b)(3), which states, "[t]his section applies to any action described in subdivision (a) that is based upon conduct that occurred on or after January 1, 2009, and is commenced on or after January 1, 2019, that would have been barred solely because the applicable statute of limitations has or had expired. Such claims are hereby revived and may be commenced until December 31, 2026."

244.    CCP § 340.16. Sexual Abuse and Cover Up Accountability Act states as follows:

(a) In any civil action for recovery of damages suffered as a result of sexual assault, where the assault occurred on or after the plaintiff's 18th birthday, the time for commencement of the action shall be the later of the following:

(1) Within 10 years from the date of the last act, attempted act, or assault with the intent to commit an act, of sexual assault against the plaintiff.

(2) Within three years from the date the plaintiff discovers or reasonably should have discovered that an injury or illness resulted from an act, attempted act, or assault with the intent to commit an act, of sexual assault against the plaintiff.

(b) (1) As used in this section, "sexual assault" means any of the crimes described in Section 243.4, 261, 264.1, 286, 287, or 289, or former Sections 262 and 288a, of the Penal Code, assault with the intent to commit any of those crimes, or an attempt to commit any of those crimes.

(2) For the purpose of this section, it is not necessary that a criminal prosecution or other proceeding have been brought as a result of the sexual assault or, if a criminal prosecution or other proceeding was brought, that the prosecution or proceeding resulted in a conviction or adjudication. This subdivision does not limit the availability of causes of action permitted under subdivision (a), including causes of action against persons or entities other than the alleged person who committed the crime.

(3) This section applies to any action described in subdivision (a) that is based upon conduct that occurred on or after January 1, 2009, and is commenced on or after January 1, 2019, that would have been barred solely because the applicable statute of limitations has or had expired. Such claims are hereby revived and may be commenced until December 31, 2026. This subdivision does not revive any of the following claims:

(A) A claim that has been litigated to finality in a court of competent jurisdiction before January 1, 2023.

(B) A claim that has been compromised by a written settlement agreement between the parties entered into before January 1, 2023.

…

(e) (1) Notwithstanding any other law, any claim seeking to recover damages suffered as a result of a sexual assault that occurred on or after the plaintiff's 18th birthday that would otherwise be barred before January 1, 2023, solely because the applicable statute of limitations has or had expired, is hereby revived, and a cause of action may proceed if already pending in court on January 1, 2023, or, if not filed by that date, may be commenced between January 1, 2023, and December 31, 2023.

(2) This subdivision revives claims brought by a plaintiff who alleges all of the

following:

(A) The plaintiff was sexually assaulted.

(B) One or more entities are legally responsible for damages arising out of the sexual assault.

(C) The entity or entities, including, but not limited to, their officers, directors, representatives, employees, or agents, engaged in a cover up or attempted a cover up of a previous instance or allegations of sexual assault by an alleged perpetrator of such abuse.

(3) Failure to allege a cover up as required by subparagraph (C) of paragraph (2) as to one entity does not affect revival of the plaintiff's claim or claims against any other entity.

(4) For purposes of this subdivision:

(A) "Cover up" means a concerted effort to hide evidence relating to a sexual assault that incentivizes individuals to remain silent or prevents information relating to a sexual assault from becoming public or being disclosed to the plaintiff, including, but not limited to, the use of nondisclosure agreements or confidentiality agreements.

(B) "Entity" means a sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity.

(C) "Legally responsible" means that the entity or entities are liable under any theory of liability established by statute or common law, including, but not limited to, negligence, intentional torts, and vicarious liability.

(5) This subdivision revives any related claims, including, but not limited to, wrongful termination and sexual harassment, arising out of the sexual assault that is the basis for a claim pursuant to this subdivision.

(6) This subdivision does not revive either of the following claims:

(A) A claim that has been litigated to finality in a court of competent jurisdiction before January 1, 2023.

(B) A claim that has been compromised by a written settlement agreement between the parties entered into before January 1, 2023.

(7) This subdivision shall not be construed to alter the otherwise applicable burden of proof, as defined in Section 115 of the Evidence Code, that a plaintiff has in a civil action subject to this section.

(8) Nothing in this subdivision precludes a plaintiff from bringing an action for sexual assault pursuant to subdivisions (a) and (b).

245.   As described herein above and below, Defendants subjected Plaintiff to sexual assault and sexual battery between the years of 2012 and 2016.

246.   Some of the acts of sexual assault and sexual battery committed against Plaintiff took place while Plaintiff was under the age of 18.

247.   CCP § 340.16(b)(1) defines "sexual assault" as "any of the crimes

described in Section 243.4, 261, 264.1, 286, 287, or 289, or former Sections 262 and 288a, of the Penal Code, assault with the intent to commit any of those crimes, or an attempt to commit any of those crimes."

248.   Penal Code § 243.4(a) defines sexual assault as "Any person who touches an intimate part of another person while that person is unlawfully restrained by the accused or an accomplice, and if the touching is against the will of the person touched and is for the purpose of sexual arousal, sexual gratification, or sexual abuse, is guilty of sexual battery."

249.   Penal Code § 261 states "(a) Rape is an act of sexual intercourse accomplished under any of the following circumstances: . . . (2) If it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another. (3) If a person is prevented from resisting by an intoxicating or anesthetic substance, or a controlled substance, and this condition was known, or reasonably should have been known by the accused. (4) If a person is at the time unconscious of the nature of the act, and this is known to the accused . . . "

250.   Penal Code § 287 states, "(a) Oral copulation is the act of copulating the mouth of one person with the sexual organ or anus of another person. (b)(1) Except as provided in Section 288, any person who participates in an act of oral copulation with another person who is under 18 years of age shall be punished by imprisonment in the state prison, or in a county jail for a period of not more than one year."

251. Penal Code § 289(a)(1)(A) states, "Any person who commits an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment in the state prison for three, six, or eight years."

252. As described herein above and below, Defendant REDER touched an intimate part of Plaintiff while Respondent REDER restrained Plaintiff, through the use of power dynamics and substances that inebriated Plaintiff, was against Plaintiff's will, and was done for the purpose of sexual arousal, sexual gratification, and/or sexual abuse.

253. As described herein above and below, Respondent REDER raped Plaintiff when Respondent REDER committed an act of sexual intercourse on and with Plaintiff against Plaintiff's will by means of force and duress. Respondent REDER used intoxicating substances and controlled substances knowingly to prevent Plaintiff from resisting, or should have reasonably known, that the use of such substances would prevent Plaintiff from resisting. Respondent REDER knew, or reasonably should have known, that Plaintiff was unconscious of the nature of the act due to being intoxicated or under the influence of a controlled substance.

254. As described herein above and below, Respondent REDER engaged in oral copulation with Plaintiff. Plaintiff was under the age of 18 during some of the acts of oral copulation.

255.   As described herein above and below, Defendants PR, PRE, PRE P, MUSIC, FESTIVAL, COLUMBIA SUSSEX, CAROLYN, ROGERS, and COLUMBIA SUSSEX MANAGEMENT, through Respondent REDER and their employees, knew, or reasonably should have known, of the acts being committed by Respondent REDER, and aided Respondent REDER in covering up his acts of sexual assault and sexual battery against Plaintiff.  CCP § 340.16(e)(4)(A) defines "Cover up" as a "concerted effort to hide evidence relating to a sexual assault that incentivizes individuals to remain silent or prevents information relating to a sexual assault from becoming public or being disclosed to the plaintiff, including, but not limited to, the use of nondisclosure agreements or confidentiality agreements."  Defendants attempted to cover up Respondent REDER's sexual assault and sexual battery of Plaintiff by concealing Plaintiff's true relationship to Respondent REDER, Plaintiff's true age, and obtaining the silence and confidentiality of individuals through the use of gifts and exchange of other items of value, among the other acts that constitute a cover up described above.

256.   Defendants are liable to Plaintiff under CCP §§ 340.16(a), (b), and (e).

257.   As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that Plaintiff has suffered actual, consequential and incidental financial losses, including without limitation loss of salary and benefits, and the intangible loss of employment-related opportunities for growth in Plaintiff's field and damage to Plaintiff's reputation, all in an amount subject to proof at the time of

trial. Plaintiff claims such amounts as damages together with prejudgment interest pursuant to Civil Code sections 3287 and/or 3288 and/or any other provision of law providing for prejudgment interest.

258.   As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has suffered and continues to suffer anxiety, worry, embarrassment, humiliation, mental anguish, and emotional distress.  Plaintiff has further experienced other physical symptoms arising from the wrongful acts of Defendants, and each of them.  Plaintiff will continue to experience said pain and physical and emotional suffering for a period in the future Plaintiff cannot presently ascertain, all in an amount subject to proof at the time of trial.

259.   The acts taken toward Plaintiff were carried out by and/or ratified by Defendants and/or managing agent employees of Defendants acting in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, and inexcusable manner pursuant to California Civil Code Section 3294, in order to injure and damage Plaintiff, thereby justifying an award to them of punitive damages in a sum appropriate to punish and make an example of Defendants, and each of them.

//

//

//

//

//

COMPLAINT FOR MONETARY AND PUNITIVE DAMAGES

## THIRD CAUSE OF ACTION

### FOR SEXUAL BATTERY

(Against Defendants PR, PRE, PRE P, MUSIC, FESTIVAL, COLUMBIA SUSSEX,

COLUMBIA SUSSEX MANAGEMENT, and REDER)

260.   Plaintiff incorporates by reference and re-alleges the preceding

paragraphs, as though fully stated herein.

261.   As described herein above, Defendant REDER caused, and intended to

cause, imminent apprehension of a harmful and offensive contact with an intimate part

of another.  In doing these acts, Defendant REDER caused, and intended to cause,

imminent apprehension of a harmful and offensive contact with Plaintiff, in violation

of, inter alia, Civil Code section 1708.5, and related laws. At no time did Plaintiff

consent to any of the acts of Defendant REDER described herein.

262.   As a result of Defendant REDER's conduct, Plaintiff was placed in

apprehension and fear for Plaintiff's physical well-being.

263.   Defendant REDER's sexual battery involved actual physical contact.

264.   Defendant REDER did the aforementioned acts with the intent to cause a

harmful or offensive contact with an intimate part of Plaintiff's person and would

offend a reasonable sense of personal dignity. Further, said acts did cause a harmful or

offensive contact with an intimate part of Plaintiff's person that would offend a

reasonable sense of personal dignity.

265.   Because of Defendant REDER's position of authority over Plaintiff,

Plaintiff's age during some of the events, and Plaintiff's mental and emotional state, Plaintiff was unable to, and did not, give legal consent to such acts.

266.   As a direct, legal and proximate result of the acts of Defendant REDER, Plaintiff sustained serious and permanent injuries to Plaintiff's person, all of Plaintiff's damage in an amount to be shown according to proof and within the jurisdiction of the Court.

267.   Defendants PR, PRE, PRE P, MUSIC, FESTIVAL, WEINER, COLUMBIA SUSSEX, and COLUMBIA SUSSEX MANAGEMENT knew or should have known, of the assaults and batteries, but ratified the conduct, as described herein above, by failing to adequately, or at all take remedial steps against Defendant REDER, refusing to intervene to protect Plaintiff, among other acts of ratification.  As Plaintiff's employers and by ratifying Defendant REDER's misconduct, Defendants PR, PRE, PRE P, MUSIC, FESTIVAL, COLUMBIA SUSSEX, and COLUMBIA SUSSEX MANAGEMENT are liable to Plaintiff for battery and assault.

268.   As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that Plaintiff has suffered actual, consequential and incidental financial losses, including without limitation loss of salary and benefits, and the intangible loss of employment-related opportunities for growth in Plaintiff's field and damage to Plaintiff's reputation, all in an amount subject to proof at the time of trial. Plaintiff claims such amounts as damages together with prejudgment interest pursuant to Civil Code sections 3287 and/or 3288 and/or any other provision of law

1   providing for prejudgment interest.

2   269.   As a proximate result of the wrongful acts of Defendants, and each of

3   them, Plaintiff has suffered and continues to suffer anxiety, worry, embarrassment,

4   humiliation, mental anguish, and emotional distress.  Plaintiff has further experienced

5   other physical symptoms arising from the wrongful acts of Defendants, and each of

6   them.  Plaintiff will continue to experience said pain and physical and emotional

7   suffering for a period in the future Plaintiff cannot presently ascertain, all in an

8   amount subject to proof at the time of trial.

9   270.   The acts taken toward Plaintiff were carried out by and/or ratified by

10  Defendants and/or managing agent employees of Defendants acting in a despicable,

11  oppressive, fraudulent, malicious, deliberate, egregious, and inexcusable manner

12  pursuant to California Civil Code Section 3294, in order to injure and damage

13  Plaintiff, thereby justifying an award to them of punitive damages in a sum

14  appropriate to punish and make an example of Defendants, and each of them.

## FOURTH CAUSE OF ACTION

### FOR SEXUAL ASSAULT

(Against Defendants PR, PRE, PRE P, MUSIC, FESTIVAL, COLUMBIA SUSSEX,

COLUMBIA SUSSEX MANAGEMENT, and REDER)

271.   Plaintiff incorporates by reference and re-alleges the preceding

paragraphs, as though fully stated herein.

272.   Defendant REDER committed several overt acts of sexual abuse, assault,

and battery against Plaintiff.

273.   Defendant REDER intended to inflict a harmful or offensive conduct against Plaintiff and intended to cause Plaintiff to fear such contact.  Defendant REDER knew that the consequence of an offensive contact was certain to result, as Defendant REDER's sexual abuse was intentionally inflicted.

274.   Defendant REDER's actions placed Plaintiff in apprehension of an immediate harmful or offensive contact.

275.   Plaintiff did not consent to Defendant REDER's harmful or offensive contact with Plaintiff's person, or to Defendant REDER's conduct, putting Plaintiff in imminent apprehension of such contact.

276.   In doing the things herein alleged, Defendant REDER violated Plaintiff's right under California Civil Code § 43 of protection from bodily restraint or harm, and from personal insult. In doing the things herein alleged, Defendant REDER violated his duty, pursuant to California Civil Code §1708, to abstain from injuring the person of Plaintiff or infringing upon Plaintiff's rights.

277.   As a result of the above-described conduct and wrongful acts of Defendants, and each of them, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from performing daily activities and obtaining the full

enjoyment of life; will sustain loss of earnings and earning capacity, and/or has

incurred and will continue to incur expenses for medical and psychological treatment,

therapy, and counseling.

278.   Defendant REDER's sexual assault is a substantial factor in bringing

about these harms to Plaintiff.

279.   The conduct of Defendants was oppressive, malicious and despicable in

that it was intentional and done in conscious disregard for the rights and safety of

others, and were carried out with a conscious disregard of Plaintiff's right to be free

from such tortious behavior, such as to constitute oppression, fraud or malice pursuant

to California Civil Code section 3294, entitling Plaintiff to punitive damages against

Defendant REDER's in an amount appropriate to punish and set an example of

Defendants.

## FIFTH CAUSE OF ACTION
### FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(Against Defendant REDER)

280.   The allegations of each of the preceding paragraphs are re-alleged and

incorporated herein by reference.

281.   By engaging in the above-described conduct, Defendant REDER

engaged in extreme and outrages conduct with the intention of causing, or reckless

disregard of the probability of causing, emotional distress.

282.   Plaintiff has suffered and continues to suffer anxiety, worry,

embarrassment, humiliation, mental anguish, and severe emotional distress.

283.   Plaintiff's damages were the actual and proximate causation of the emotional distress caused by Defendant's outrageous conduct.

284.   Defendant's conduct was reckless and with a conscious disregard of Plaintiff's rights. Plaintiff is therefore entitled to an award of punitive damages against Defendant in an amount to be determined by proof at trial.

## SIXTH CAUSE OF ACTION

### FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

(Against Defendant REDER)

285.   The allegations of each of the preceding paragraphs are re-alleged and incorporated herein by reference.

286.   Defendant REDER knew or should have known that his conduct infilicted emotional distress upon Plaintiff, especially considering the above trafficking, assaults, and batteries Defendant REDER subjected him too.

287.   Defendant REDER owed Plaintiff a duty of care to act in a reasonable and ordinary manner so as not to cause Plaintiff any foreseeable harm.

288.   Defendant REDER failed to use ordinary and reasonable care in order to avoid injury to Plaintiff. This includes, but is not limited to, Defendant REDER stalking Plaintiff and tracking Plaintiff by contacting one of Plaintiff's sisters and asking about Plaintiff.

289.   The conduct of Defendant REDER constitutes negligence and is actionable under the laws of the State of California. As a direct and proximate result

of the acts of Defendant REDER, Plaintiff has suffered and continues to suffer, without limitation, from urinary restriction, a voiding dysfunction (urinary retention), dissociation, disorderly eating, self-mutilation, severe mood swings, severe anxiety, severe depression, and paranoia. Plaintiff has been diagnosed with and suffers from Post-Traumatic Stress Disorder, Borderline Personality Disorder, Chronic Depression, and Generalized Anxiety Disorder.

290.   As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

291.   Defendant's conduct was reckless and with a conscious disregard of Plaintiff's rights. Plaintiff is therefore entitled to an award of punitive damages against Defendants in an amount to be determined by proof at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF prays for judgment as follows:

As to All Causes of Action

1.  For general, compensatory, and/or special damages in an amount according

to proof for Plaintiff's injuries, mental and/or emotional distress, medical expenses, actual financial losses, consequential financial losses, incidental financial losses, loss of past and future earnings, loss of salary and benefits, and all damages flowing therefrom for an amount to be determined at trial;

2. For all general and special damages to compensate Plaintiff for an amount to be determined at trial;

3. For punitive damages, as allowed by law, that will sufficiently punish, make an example of, and deter future conduct by Defendants for an amount to be determined at trial;

4. For prejudgment and post-judgment interest according to any applicable provision of law, according to proof for an amount to be determined at trial;

5. For attorney's fees and costs for an amount to be determined at trial;

6. Costs of suit; and

7. For such other and further relief as the Court may deem just and proper.

Dated: August 9, 2024

**DEREK SMITH LAW GROUP, LLP**
*Attorneys for Plaintiff JOHN DOE*

By: _/s/ Matt E.O. Finkelberg, Esq._
MATT E.O. FINKELBERG, ESQ.
633 West 5th St., Suite 3250
Los Angeles, CA 90071
(310) 602-6050

COMPLAINT FOR MONETARY AND PUNITIVE DAMAGES

1

## <u>DEMAND FOR JURY TRIAL</u>

2

3

Plaintiff hereby demands a jury trial on all issues to be tried and all causes of

4

action and claims with respect to which Plaintiff has a right to jury trial.

5

6

Dated: August 9, 2024

7

**DEREK SMITH LAW GROUP,
LLP**

8

*Attorneys for Plaintiff JOHN DOE*

9

10

By:  *<u>/s/ Matt E.O. Finkelberg, Esq.</u>*

11

MATT E.O. FINKELBERG, ESQ.

12

633 West 5th St., Suite 3250
Los Angeles, CA 90071

13

(310) 602-6050

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR MONETARY AND PUNITIVE DAMAGES